**IN THE DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SUZETTE RICHARDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DUKE UNIVERSITY, DUKE UNIVERSITY | ) | |
| SCHOOL OF LAW, DUKE UNIVERSITY | ) | |
| BOARD OF TRUSTEES, NANNERL | ) | |
| KEOHANE, in her personal and official | ) | CIVIL NO. 06-01179 (RCL) |
| Capacity as President of Duke University | ) | |
| GEORGETOWN UNIVERSITY, | ) | |
| GEORGETOWN UNIVERSITY LAW | ) | |
| CENTER, in his official | ) | |
| Capacity as Attorney General of the United | ) | |
| States, FEDERAL BUREAU OF | ) | |
| INVESTIGATION, U.S. DEPARTMENT OF | ) | |
| JUSTICE, and JOHN and JANE DOES 1-10, | ) | |
| WILLIAM H. GATES, III, in his personal and | ) | |
| official capacity as Chairman of Microsoft | ) | |
| Corporation, STEVE BALLMER, in his | ) | |
| personal and Official capacity as Chief | ) | |
| Executive Officer of Microsoft Corporation, | ) | |
| MICROSOFT CORPORATION, MICROSOFT | ) | |
| EMPLOYEES A-J and MELINDA GATES, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**GEORGETOWN UNIVERSITY'S MOTION TO DISMISS**

Georgetown University[1] (hereinafter referred to as "Georgetown") through

counsel respectfully submits this Memorandum of Law in support of its Motion To

Dismiss on the grounds that the Court lacks subject matter jurisdiction pursuant to

Rule 12(b)(1) of the Federal Rules of Civil Procedure, and alternatively pursuant to

---

[1] Georgetown University Law Center is not a separate entity from Georgetown University capable of being sued. Accordingly, "Georgetown University" includes the University as well as its Law Center.

this Court's inherent authority under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2]

## BACKGROUND

### I.    THE ALLEGATIONS IN PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Suzette Richards, an attorney, brought this action *pro se* on or about May 8, 2003 in the District Court of the Virgin Islands where she resides.  In her outrageous and voluminous 56-page First Amended Complaint ("Amended Complaint" or "Am. Compl.") filed on June 5, 2003, Plaintiff alleges a vast and far-reaching conspiracy on the part of the named Defendants – Duke University, Duke University School of Law, its Board of Trustees and its President, Georgetown University, Georgetown University Law Center, John Ashcroft as Attorney General of the United States, the Federal Bureau of Investigation, the United States Department of Justice, Microsoft Corporation, Bill Gates as Chairman of Microsoft Corporation, Steve Ballmer as Chief Executive Officer of Microsoft, and Mrs. Melinda Gates (collectively "Defendants") – as well as "other persons and companies in corporate America, the media, and all over the world" to illegally monitor her by electronic surveillance in order to perpetuate Defendants' "fraudulent, discriminatory and criminal acts."    *See* Am. Compl. ¶¶ 37-47.    This "illegal

---

[2] While there are ample additional grounds on which to dismiss the instant action, in the interests of judicial economy Georgetown currently moves to dismiss this case pursuant to Fed. R. Civ. P. 12(b)(1), and alternatively pursuant to the Court's authority under Fed. R. Civ. P. 12(b)(6).   If necessary, Georgetown will submit additional briefing requesting that this Court dismiss the instant action on additional substantive grounds pursuant to Fed. R. Civ. P. 12(b)(6).

electronic surveillance" is alleged to have occurred from 1998 through the present day. *Id.* at ¶ 47.

According to the Amended Complaint, Plaintiff Richards attended Duke University from 1992 until her graduation in May 1996. She then attended Duke University School of Law from 1997 to 1998. *Id.* at ¶¶ 28-31. During that year, she claims to have been placed under electronic surveillance by Duke (with the help of Defendants FBI and U.S. Department of Justice) to "obtain information to continue to discriminate against Plaintiff, as well as to harass, humiliate, demean and terrorize [her]." *Id.* at ¶ 38. She requested and received a transfer to Georgetown University Law Center in May 1998 where she completed her legal studies, graduating with a *juris doctor* degree in late May of 2000. *Id.* at ¶32.

Plaintiff claims that she was discriminated against by Duke Law School in and out of the classroom due to her race, ethnicity, and gender when Duke Law School, *inter alia*, instituted a fraudulent grading scheme whereby Duke fraudulently manipulated grades based on illegal factors, "intentionally and willfully lied to students about how to take exams," and contacted professors at Georgetown Law in furtherance of the conspiracy to discriminate against her and to harm her academically, professionally and personally. *See, e.g., Id.* at ¶¶ 35-40, 49, 55-58, 68, 90, and 104-173.

Plaintiff further alleges that Georgetown conspired with Duke to continue to discriminate against her once she transferred to Georgetown. *Id.* at ¶39. In particular, Plaintiff claims that that Georgetown and Duke conspired to prevent her

from writing for any of Georgetown's law journals, and that Georgetown professors discriminated against her by calling on her to answer questions with more frequency than they did other students. *Id.* at ¶¶173-179, 186. In furtherance of this conspiracy, Georgetown electronically monitored Plaintiff to see if she completed assigned reading, and professors entered her on-campus apartment to gather intelligence about her study habits. *Id.* at ¶¶180-183. Plaintiff even claims that Duke and Georgetown attempted to make it appear as if she was homosexual, and radically changed a draft article she had written for the *Georgetown Gender Journal* to include issues involving sexuality. *Id.* at ¶¶ 187-191.

The implausible allegations do not end with the purported actions of Georgetown. Plaintiff also alleges that Microsoft, through the claimed illegal surveillance, stole her intellectual property – ideas about e-mail sales that Plaintiff had written down while in the bedroom of the home of a family member – and that as a result, Microsoft generated more than $3 billion in revenue in only one season. *Id.* at ¶¶267-281. Moreover, according to Plaintiff, the MSN website "is in large part as popular as it is today because of the ideas that came from [her]," ideas which were written at her desk at work and obtained through illegal surveillance *Id.* at ¶¶ 216, 274-75. Prior to the time Plaintiff purportedly invented the MSN website, she had a "private conversation in her home where she mentioned the potential for wireless technology to affect certain markets," an idea which, again, was stolen through surveillance so that Defendants could "criticize Plaintiff, and make it appear that [she] was stupid . . . [and] make it seem that not only could [she] never

succeed as an attorney, but she could also not succeed in any other profession, including the business profession." *Id.* at ¶¶ 209-210.

The story does not end there. The CEO of Microsoft, Mr. Bill Gates, is one of the central characters in Plaintiff's conspiracy theory. Mr. Gates purportedly developed an "obsessive attraction" towards Plaintiff during her third year of law school. As a result, Defendants continue to keep plaintiff under illegal electronic surveillance and to discriminate against her for fear that Mr. Gates will "leave his wife, who is white, for Plaintiff, who is black." *Id.* at ¶¶193-194. According to Plaintiff, Mr. Gates even placed false statements on the MSN website to make it appear as if he was romantically involved with Plaintiff, and to "make it appear that Plaintiff was pregnant for him," even though "Plaintiff has never even personally met Bill Gates and Plaintiff has never been his mistress." *Id.* at ¶¶224-226.[3] While Mr. Gates is allegedly "very much aware that Plaintiff wants nothing to do with him," he nevertheless "has refused to leave [her] alone, as not only does he want to exploit Plaintiff for his own financial gain, but he is also a voyeur." *Id.* at ¶¶ 235-36.

Plaintiff contends that this massive conspiracy is ongoing and that the illegal electronic surveillance is continuous and pervasive. Specifically, Plaintiff claims that listening devices and hidden video camera surveillance have been placed in her

---

[3] According to Plaintiff, Mrs. Melinda Gates also participated in this conspiracy. *Id.* at ¶ 199. Among other allegations, Mrs. Gates is claimed to have made statements in an article that "were actually the same statements made in [Plaintiff's] home," and "the only way [Mrs. Gates] could have gotten access to such statements was if she was illegally intercepting the surveillance in Plaintiff's home." *Id.* at ¶¶ 250, 252. Like Mr. Gates, Mr. Steve Ballmer also was allegedly responsible for harassing Plaintiff by placing false statements about Plaintiff on the MSN website, and encouraged Microsoft employees to perpetuate the conspiracy to discriminate against her. *Id.* at ¶¶ 220, 264-66.

home (including her bedroom and bathroom), at her doctor's offices during medical examinations, at work both as a law clerk at the Territorial Court of the Virgin Islands and in private practice, and in cars and planes, and that her phone has been wire tapped, because the Defendants "are sexual predators intent on harming Plaintiff," and are attempting "to obtain information of a sexual nature about Plaintiff, and specifically attempt to see if Plaintiff is engaged in sexual intercourse, and if she is, with whom Plaintiff is having sex." *Id.* at ¶¶54-56 and 59-68. These are but some of the numerous, extraordinary allegations contained in Plaintiff's 56-page Amended Complaint.

## II.   PROCEDURAL HISTORY

Because of the nature of these delusional and wild allegations, Defendant Duke University requested that the District Court of the Virgin Islands consider the appropriateness of an appointment of a guardian *ad litem*. Clinical psychologist Dr. G. Rita Dudley-Grant was asked by Duke to review the Complaint and the Amended Complaint.

Dr. Dudley-Grant issued a report dated July 21, 2003. She concluded that the allegations in Plaintiff's pleadings "present several of the symptoms that would be consistent with an individual experiencing Paranoid Schizophrenia or a Delusional Psychosis." *See* Psychological Evaluation Report of Dr. G. Rita Dudley-Grant dated July 21, 2003 ("Dr. Dudley-Grant Report"), attached hereto as Exhibit A at 4; Curriculum Vitae of Dr. G. Rita Dudley-Grant, attached hereto as Exhibit B. Dr. Dudley-Grant "strongly recommended" that Plaintiff undergo a psychiatric examination and receive treatment as necessary. Upon consideration of the

Doctor's recommendation and the relevant law, Magistrate Judge Jeffrey L. Resnick ("Magistrate") ordered Plaintiff to be examined by Dr. Olaf G. Hendricks, a psychiatrist appointed by the Court to evaluate her competence to prosecute this matter.

After reviewing the relevant pleadings and fully evaluating Plaintiff in person, Dr. Hendricks issued a report dated August 25, 2003 in which he concluded that "within reasonable medical probability, Ms. Richards is suffering from a chronic Delusional Disorder, Mixed Type, and as a direct result, she is incapable of distinguishing between reality and delusion (and is clearly unable) to prosecute this matter . . ." *See* Report of Dr. Olaf G. Hendricks dated August 25, 2003 ("Dr. Hendricks Report"), attached hereto as Exhibit C; and Curriculum Vitae of Dr. Olaf G. Hendricks, attached hereto as Exhibit D.

On November 14, 2003, the Magistrate held a hearing to discuss the issue of Plaintiff's competence to proceed *pro se*. The Magistrate ordered that a guardian *ad litem* be appointed. Plaintiff filed a Notice of Appeal of the Magistrate's decision and a 64-page pleading objecting to the Magistrate's Order. Defendants Georgetown, Duke and Microsoft responded to Plaintiff's objections. Plaintiff filed separate lengthy replies to Defendants Georgetown (38 pages), Duke (50 pages), and Microsoft (56 pages), and repeatedly sought to depose the court reporter who had transcribed the November 14, 2003 hearing, claiming that the transcript contained numerous material errors and alterations which had been purposefully done to prejudice her on appeal.

On December 30, 2004, the District Court of the Virgin Islands affirmed the the November 14, 2003 Magistrate's Order.  The Plaintiff appealed to the Third Circuit which, in an opinion issued on January 20, 2006, held that the District Court had not applied the correct legal standard and had failed to make factual findings sufficient to support its decision.  On June 2, 2006, the District Court of the Virgin Islands granted Defendants' unopposed motion to transfer this case to the District Court for the District of Columbia.

## III.   THE MENTAL EVALUATIONS OF PLAINITFF BY DR. DUDLEY-GRANT AND DR. HENDRICKS

### A.   Dr. G. Rita Dudley-Grant

Dr. Dudley-Grant is a licensed and board-certified clinical psychologist.[4]   As stated above, Dr. Dudley-Grant concluded that Plaintiff evidenced symptoms consistent with Paranoid Schizophrenia or a Delusional Psychosis.  *See* Dr. Dudley-Grant Report, Ex. A at 4.  As Dr. Dudley-Grant explained:

> From these few excerpts of the lengthy documents [Plaintiff's pleadings], its appears that the Plaintiff has developed an extensive belief system regarding the difficulties that she has had over the past five years. There are several aspects of this belief system which cause concern regarding the Plaintiff's reality testing.   The Diagnostic and Statistical Manual, Fourth Edition is the currently accepted standard of mental health diagnoses in

---

[4] Dr. Dudley-Grant obtained a masters degree and her doctorate in clinical psychology from Adelphi University, and a masters degree in public health from Harvard University School of Public Health. She served as the Chief Psychologist at the Acute Day Hospital of the Solomon Carter Fuller Mental Health Center in Boston, Massachusetts; as Clinic Director and Supervisor of the Psychotherapy/Psychodiagnostic Training Clinic at Boston City Hospital; as Director of the Child and Adolescents Crisis Team of the Department of Psychology, Boston City Hospital; and as Chief of Psychology of Boston City Hospital's Department of Psychology and Psychiatry.  In the U.S. Virgin Islands, she has served as both Assistant Commissioner of Health and Acting Commissioner of Health of the Virgin Islands Department of Health.  *See* Curriculum Vitae of Dr. Dudley-Grant, Ex. B.

the field.  It describes the narrowest definition of psychotic as "restricted to delusions or prominent hallucinations with the hallucinations occurring in the absence of insight into their pathological nature" (p. 273).   It describes delusions as "erroneous beliefs that usually involve a misinterpretation of perceptions or experiences," the content of which can be persecutory, referential, somatic, religious or grandiose.    The persecutory is the most common, where a person believes he or she is being "tormented, followed, tricked, spied on or subjected to ridicule." *The Plaintiff's description of the conspiracy and the surveillance bears almost a textbook relationship to the description of the persecutory delusion.*"

*Id.* at 2-3 (emphasis added).

Dr. Dudley-Grant described the psychology of "referential delusions" in which gestures, comments or other environmental cues are perceived by the individual as being specifically directed to her.   In her report, she pointed out several of the allegations made by Plaintiff that evidence referential delusions, and noted that Plaintiff's allegations reflected "an extreme level of grandiose thinking." *Id.* at 3.    Dr. Dudley-Grant also remarked upon "the Plaintiff's sexual preoccupation, which is another common symptom of psychiatric disturbance," and explained that "[w]ith a delusional psychosis, the individual often becomes convinced that some injustice must be remedied by legal action, resulting in repeated attempts to obtain satisfaction by appeal to the courts and other government agencies." *Id.*

### B.    Dr. Olaf G. Hendricks

Dr. Hendricks is a licensed and board-certified psychiatrist.[5]  Dr. Hendricks concurred with Dr. Dudley-Grant's findings that Plaintiff suffers from a delusional state in which "she is devoid of logic, judgment, and insight."  *See* Report of Dr. Hendricks Report, Ex. C at 3.  Specifically, Dr. Hendricks concluded that Plaintiff suffers from a Delusional Disorder, Mixed Type (Grandiose Type, Persecutorial Type).[6]  *Id.*  In discussing Plaintiff's delusional thoughts, Dr. Hendricks explained:

> Unfortunately for her she has been able to persist in these thoughts for a long time and they have become entrenched and fixed on to the hard-drive components of her brain. *They have become her reality and she lives predominantly under the influences of the dynamics of that reality.*  They have become systematized.  Even her visit to her private physician is contaminated with surveillance and interception.  She has developed defensive tactics vis-à-vis her nieces as she fears that their lives too will be broadcast perhaps even over the internet, as a result of covert surveillance activities being conducted (illegally) in her home.  That almost no one has confronted her delusional thinking is a tragedy.

---

[5] Dr. Hendricks obtained his medical degree from Howard University, Washington D.C., where he also completed his residency in psychiatry.  For over 23 years, he has served as Chief of the Juan F. Luis Hospital's Psychiatric Unit in the U.S. Virgin Islands, and has served*, inter alia,* as both Assistant Commissioner and Acting Commissioner of the U.S. Virgin Islands Department of Health, as well as the Acting Director of the Division of Mental Health, Alcoholism and Substance Abuse Services for the U.S. Virgin Islands Department of Health.  *See* Curriculum Vitae of Dr. Hendricks, Ex. D.

[6] Dr. Hendricks explained that a Grandiose Type applies when the central theme of the delusion is the belief of having some great talent or having made some important discovery, and may include the delusion of having a special relationship with a prominent person.  *Id.* at 3.  A Persecutory Type applies when the central theme of the delusion involves the belief that the individual is being conspired against, spied on, harassed or maligned.  *Id.*  "*The focus of the delusion is often on some injustice that must be remedied by legal action . . .* and the affected person may engage in repeated attempts to obtain satisfaction by the courts and other government agencies."  *Id.*  (emphasis in original).

*Id.* (emphasis added).   Dr. Hendricks concluded that in his professional opinion, Plaintiff "is incapable of distinguishing between reality and delusion (and is clearly unable) to prosecute this matter."   *Id.* at 5.

## ARGUMENT

### I.    STANDARD OF REVIEW

The plaintiff has the burden of establishing that the Court has subject matter jurisdiction. *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936); *Galucci v. Chao*, 374 F. Supp. 2d 121, 123 (D.D.C. 2005); *Rasal v. Bush*, 215 F. Supp. 2d 55, 61 (D.D.C. 2002), *rev'd on other grounds*, 542 U.S. 466 (2004).   In determining whether a plaintiff has met this burden, a district court has the authority to weigh conflicting evidence when the facts relevant to subject matter jurisdiction are in dispute, and thus may consider matters outside the pleadings.   *See Carone-Ferdinand v. CIA,* 131 F. Supp. 2d 232, 235 (D.D.C. 2001).   A plaintiff's allegations must be given closer scrutiny by the court when reviewing a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction than a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted.   *Macharian v. United States*, 334 F.3d 61, 64, 68-69 (D.C. Cir. 2003); *Bernard v. U.S. Dep't of Def.*, 362 F. Supp. 2d 272, 277 (D.D.C. 2005).

## II.    THE FIRST AMENDED COMPLAINT IS SO ATTENUATED AND UNSUBSTANTIAL THAT THIS COURT LACKS SUBJECT MATTER JURISDICTION

It is well-settled that federal courts "are without power to entertain claims otherwise within their jurisdiction if they are so attenuated and insubstantial as to be absolutely devoid of merit, wholly insubstantial, [or] obviously frivolous[.]" *Hagans v. Lavine*, 415 U.S. 528, 536-37 (1974); *see also Steel Co. v. Citizens For A Better Environment*, 523 U.S. 83, 89 (1998) ("the district court has jurisdiction . . . unless the claim . . . is wholly insubstantial and frivolous") (citations and quotations omitted).

A complaint will be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) when it is "'patently insubstantial,' presenting no federal question suitable for decision." *Best v. Kelly*, 39 F.3d 328, 330 (D.C. Cir. 1994) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 n.6 (1989)).  Claims are patently insubstantial if they are "essentially fictitious," such as allegations of "bizarre conspiracy theories" or "fantastic government manipulations of [one's] will or mind." *See Bestor v. Lieberman*, Civ. A. No. 03-1470 (RWR), 2005 WL 681460, at *1 (D.D.C. March 11, 2005) (citing *Best,* 39 F.3d at 330); *Carone-Ferdinand v. CIA*, 131 F. Supp. 2d 232, 234 (D.D.C. 2001); *O'Connor v. United States*, 159 F.R.D. 22, 25 (D. Md. 1994), *aff'd*, 54 F.3d 773 (4th Cir. 1995).

Courts have routinely held that subject matter jurisdiction is lacking when the claims in question are as patently unsubstantial, outlandish and incredible as they are in Plaintiff's Amended Complaint. *See, e.g., Carone-Ferdinand*, 131 F. Supp. 2d at 234; *Bestor*, 2005 WL 681460, at *2; *Dekoven v. Bell*, 2001 WL 1450702, 22 Fed. Appx.

496, 497-98 (6th Cir. 2001); *Apple v. Glenn*, 183 F.3d 477, 480 (6th Cir. 1999), *cert. denied*, 528 U.S. 1198 (2000); *O'Connor*, 159 F.R.D. at 25.

For instance, in *O'Connor v. United States*, a case strikingly similar to the case at bar, the court held that the *pro se* plaintiff's 42-page complaint containing "fantastic and paranoid" allegations was "totally divorced from the real world" and so attenuated that the court lacked jurisdiction to adjudicate plaintiff's claims. *O'Connor*, 159 F.R.D. at 26. In that case, O'Connor, an attorney acting *pro se*, brought suit against the United States and the DEA, seeking relief from alleged unreasonable searches and seizures, as well as stalking and harassment activities conducted by the DEA. *Id.* at 23. Specifically, O'Connor claimed that he was under "the most intensive possible surveillance for a period of several years;" that his computer was electronically monitored, that his phone was tapped, his home (including every bedroom and bathroom) was wired and under video surveillance, his cars were similarly wired for surveillance and for tracking purposes, as well as his current and former law offices and their phones and computers, and various relatives' residences. *Id.* at 23-24. He also claimed, *inter alia*, that the DEA harassed him by using newspapers or magazines with suggestive headlines or print, as well as the use of civilians who would walk near him and make harassing "buzz words" or gestures. *Id.* All of this, according to O'Connor, was instigated by his neighbor, a veteran DEA agent, who had a "vendetta" against him. *Id.*

In granting defendant's motion to dismiss pursuant to Rule 12(b)(1), the *O'Connor* court took "judicial notice of the fact that there are psychiatric conditions

which cause individuals to exaggerate life situations, including ordinary conversations, slights and encounters, and interpret them in highly self-referential fashion," *Id.* at 25, and concluded that, "[h]owever lucid plaintiff's prose may be," plaintiff's claims were "absolutely devoid of merit." *Id.* at 25-26.

Similarly, in *Carone-Ferdinand*, plaintiffs alleged that the CIA, United Sates Army, and others deprived them of bank policies, bank accounts, and other property following the claimed murder of the father of one of the plaintiffs ("Mr. Carone") by Government agents. *Carone-Ferdinand*, 131 F. Supp. 2d at 232-33. Among other allegations, plaintiffs claimed that Mr. Carone helped import more than one million pounds of cocaine and had been protected from law enforcement by the efforts of William Jefferson Clinton, that Mr. Carone was ordered to assassinate President John F. Kennedy, that the CIA murdered Mr. Carone when he decided to no longer assist the CIA, and that the CIA took steps to cover up his sanctioned legal activity, which included the theft of the above-mentioned items. *Id.* at 233. This Court dismissed the complaint pursuant to Rule 12(b)(1) after finding that the plaintiffs' claims were "essentially fictitious" and completely lacking any evidence. *Id.* at 235-36. *See also Bestor v. Lieberman*, 2005 WL 681460, at *2 (granting dismissal for lack of subject matter jurisdiction because of the lack of evidence and "frivolous nature" of *pro se* plaintiff's claims against Senators Lieberman and Kennedy alleging that they were involved "in the eradication of his brain and manipulation of his thought processes via devices surreptitiously implanted in his head"); *compare Best*, 39 F.3d at 330 (prisoner plaintiffs' claims of deprivation of rights by the termination of one drug program and

replacement of another were not "essentially fictitious," nor suggestive of "any bizarre conspiracy theories").[7]

Like *Carone-Ferdinand*, this Court should dismiss the Amended Complaint, which "on its face, . . . appears to be the very type of 'bizarre conspiracy theory' that the D.C. Circuit has said warrants dismissal under Rule 12(b)(1)." *Carone-Ferdinand*, 131 F. Supp. 2d at 235.  Plaintiff's Amended Complaint, which alleges a worldwide conspiracy involving a plethora of institutions from the government, to universities, to a world-renowned software company and its executives, to "other persons and companies in corporate America, the media, and all over the world," Am. Compl. ¶¶ 47, 213, is essentially fictitious, imagined, and frivolous.

Just as the plaintiff in *O'Connor* suffered from delusional thoughts of surveillance and "suggestive headlines," so to does Plaintiff, who alleges that she has been continuously illegally monitored in virtually every facet of her existence – in every room of her home, at work, in her car, at her doctor's office, on airplanes, at relatives' homes, and even while on the Internet.  *See* Am. Compl. ¶¶ 54, 59, 63-67.

One of the central focal points of the Plaintiff's delusional word is Mr. Gates, who, as part of his "obsessive attraction" to Plaintiff, purportedly placed harassing and false statements about Plaintiff on the MSN website, including facts indicating that

---

[7] *Compare also Hilska v. Jones,* 297 F. Supp. 2d 82 (D.D.C. 2003), where the claims of a *pro se* plaintiff, a native and citizen of Finland, were allowed to proceed although "the plaintiff's claims appear[ed] implausible."  *Hilska,* 297 F. Supp. 2d at 84.  There, the court "applied the liberal pleading standards afforded to *pro se* litigants" set forth in *Anyanwutaku v. Moore*, 151 F.3d 1053, 1058 (D.C. Cir. 1998), which involved a *pro se* prisoner's pleadings.  *Id.* at 88-89.  In contrast, Plaintiff is a practicing attorney, a member of the Virgin Islands Bar Association, and a graduate of Georgetown University Law Center.  Moreover, even *pro se* litigants' claims can be dismissed under Rules 12(b)(1) and 12(b)(6).  *See, e.g., Barksdale v. Dwyer,* Civ. A. No. 90-3156 (RCL), 1991 WL 241900 (D.D.C. Oct. 31, 1991).

she was pregnant by him. *Id.* at ¶¶ 223, 226. Indeed, like *O'Connor*, discriminating and terrorizing messages are allegedly at every corner Plaintiff turns. For instance, Plaintiff claims that other people have reacted to these harassing MSN "headlines," causing her to be publicly accosted in shopping centers. *Id.* at ¶ 233. Proof of these messages and harassing surveillance even stem from magazines, such as an April 2003 article about Microsoft entitled "Look Who's Watching" that Plaintiff read on an airplane. *Id.* at ¶ 241.

Similar to relevant precedent, the record here contains not one shred of evidence supporting Plaintiff's outrageous claims. *See, e.g., Carone-Ferdinand*, 131 F. Supp. 2d at 236 ("This court simply cannot view any of the plaintiffs' claims as plausible, especially in light of the complete lack of even a scintilla of [authentic] evidence . . . "); *Bestor*, 2005 WL 681460, at *2 (dismissing complaint due to "frivolous nature of plaintiff's claims and lack of evidence presented in support of the complaint"). Plaintiff's Amended Complaint is so attenuated, implausible and patently insubstantial that it is should be dismissed for lack of subject matter jurisdiction.

## III. PLAINITFF'S PATENTLY FRIVOLOUS AMENDED COMPLAINT SHOULD BE DIMISSED PURSUANT TO THE INHERENT AUTHORITY OF THIS COURT

This Court also has the inherent authority to dismiss a *pro se* plaintiff's complaint pursuant to Rule 12(b)(6) when, like here, "the complaint on its face is absolutely bereft of merit but has simply been filed as a result of frivolity, maliciousness or irrational and unintelligible perceptions." *Tate v. Burke*, 131 F.R.D.

363, 364 (D.D.C. 1990). In *Tate*, the Court dismissed a *pro se* plaintiff's complaint, which alleged that a television network subjected her to "continuous camera surveillance" for over ten years, because the complaint was patently frivolous and not entitled to the procedural protections typically granted to *pro se* plaintiffs prior to a *sua sponte* dismissal.[8] *Id.* at 364-65. *See also Brown v. District of Unemployment Comp. Bd.*, 411 F. Supp. 1001, 1002 (D.D.C. 1775) (complaint which contained a myriad of allegations ranging from conspiracy to discrimination and harassment to attempted murder properly dismissed as frivolous or brought for some ulterior purpose); *cf. Robinson v. Love*, 155 F.R.D. 535, 536 (E.D. Pa. 1994) ("[I]f the allegations contained in the complaint, while theoretically within the realm of the possible, stand genuinely outside the common experience of human kind, such claims may also be dismissed as irrational or wholly incredible.").

For reasons already discussed, Plaintiff's Amended Complaint is patently frivolous and comprised of nothing but "irrational perceptions." Accordingly, this Court should dismiss this case pursuant to its inherent authority.

## CONCLUSION

For the reasons set forth above, Georgetown respectfully requests that the Plaintiff's Amended Complaint be dismissed for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), and alternatively pursuant to the Court's inherent authority under Fed. R. Civ. P. 12(b)(6). Georgetown expressly reserves its right to

---

[8] In so holding, the Court ruled that the "frivolity standard" of 28 U.S.C. § 1915(d) (governing *pro se* complaints filed *in forma pauperis*) "analogously provides the appropriate measure by which to determine . . whether a *pro se* complaint which as not been filed *in forma pauperis* . . . should . . . be dismissed *sua sponte* pursuant to the inherent authority of this Court." *Id.* at 365.

move to dismiss the Amended Complaint on additional substantive grounds pursuant to Fed. R. Civ. P. 12(b)(6) at a later date, if necessary.

Respectfully submitted,

HUNTER COLE & BENNETT

By: ___/s/ Richard H. Hunter_____
　　　Richard H. Hunter
　　　D.C. Bar No. 263798
　　　1138 King Street
　　　Christiansted, St. Croix
　　　U.S. Virgin Islands 00820
　　　(340) 773-3535

WILLIAMS & CONNOLLY LLP

By: ___/s/ Elizabeth A. O'Brien____
　　　Elizabeth A. O'Brien
　　　D.C. Bar No. 466314
　　　725 Twelfth Street, N.W.
　　　Washington, D.C.  20005
　　　(202) 434-5000

*Counsel for Georgetown University*

Dated: July 13, 2006