# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SUZETTE RICHARDS, | ) | |
| | ) | |
| PLAINTIFF, | ) | CIVIL NO. 06-01179 (RCL) |
| | ) | |
| v. | ) | ACTION FOR DAMAGES, |
| | ) | DISCRIMINATION, AND |
| DUKE UNIVERSITY, DUKE UNIVERSITY | ) | DECLARATORY AND |
| SCHOOL OF LAW, DUKE UNIVERSITY | ) | INJUNCTIVE RELIEF |
| BOARD OF TRUSTEES, NANNERL | ) | |
| KEOHANE, in her personal and official | ) | |
| Capacity as President of Duke University, | ) | |
| GEORGETOWN UNIVERSITY, | ) | |
| GEORGETOWN UNIVERSITY LAW CENTER, | ) | |
| ALBERTO GONZALES, in his official capacity | ) | |
| as Attorney General of the United States, | ) | |
| FEDERAL BUREAU OF INVESTIGATION, | ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) | **JURY TRIAL DEMANDED** |
| JOHN AND JANE DOES 1-10, | ) | |
| WILLIAM H. GATES, III, in his personal and | ) | |
| official capacity as Chairman of Microsoft | ) | |
| Corporation, STEVE BALLMER, in his personal | ) | |
| and official capacity as Chief Executive Officer | ) | |
| of Microsoft Corporation, MICROSOFT | ) | |
| CORPORATION, MICROSOFT EMPLOYEES | ) | |
| A-J, and MELINDA GATES, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| ——————————————————————— | ) | |

## PLAINTIFF'S OPPOSITION TO THE DUKE DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(1) AND RULE 12(b)(6)

**COMES NOW**, Plaintiff, *pro se*, and hereby respectfully opposes Defendants Duke

University, Duke University School of Law, Duke University Board of Trustees, and Nannerl

Keohane's (collectively "Duke Defendants") Motion to Dismiss that was brought pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]

## FACTUAL BACKGROUND

Plaintiff is an alumnus of Duke University ("Duke").  First Am. Compl. at ¶ 29.  After Plaintiff graduated from high school in 1992, she matriculated to Duke, and approximately four years later, having completed her undergraduate studies, she graduated from Duke in May of 1996.  First Am. Compl. at ¶¶ 27-28.  Plaintiff then returned to the Duke community in the Fall of 1997 to attend law school at the Duke University School of Law ("Duke Law").  First Am. Compl. at ¶ 30.  Plaintiff's Complaint in this matter stems from the discrimination she experienced while she was a first year law student at Duke Law.[2]  *See* First Am. Compl.

---

[1]  The Duke Defendants have incorporated, by reference, Defendant Georgetown University's entire Motion to Dismiss that was filed in this Court on July 13, 2006.  Accordingly, Plaintiff hereby incorporates, by reference, her entire Opposition to that motion that was filed in this Court on July 31, 2006.  However, to ensure that Plaintiff fully addresses the Duke Defendants' motion, Plaintiff nevertheless submits the instant Opposition.

[2] Of course, it should be noted that even though Plaintiff is alumnus of Duke University, the first thing Duke University did, approximately **ten (10) days** after it and the other Duke Defendants were served with a copy of Plaintiff's Complaint, was to submit a motion to attempt to have the Court declare Plaintiff incompetent and appoint a guardian *ad litem* to represent Plaintiff in this matter.  *See* V.I. Docket at 44-47 (showing Duke University, Duke University School of Law, Duke University Board of Trustees and Nannerl Keohane all served with Complaint on June 17, 2003); V.I. Docket at 55 (showing Duke University served motion on June 27, 2003).  In this motion, Duke University essentially conceded that it did not even investigate the allegations in the Complaint before filing the motion, as according to Duke University "the effort required to prepare answers and motions responsive to all the allegations in the First Amended Complaint would be substantial and may be futile."  V.I. Docket at 55.  While Magistrate Judge Jeffrey Resnick decided to appoint a guardian *ad litem* to represent Plaintiff in this matter, and District Court Judge Thomas Moore affirmed his decision, Plaintiff appealed these erroneous decisions to the Court of Appeals for the Third Circuit, and the Duke Defendants actually moved to dismiss Plaintiff's appeal.  *See Richards v. Duke University*, 05-1170, 2006 WL 162652 at *3 (3d Cir. Jan. 23, 2006).   However, Plaintiff opposed the Duke Defendants' motion, and the Third Circuit not only denied their motion, but also **vacated** the District Court's order that affirmed the Magistrate Judge's decision to appoint a guardian *ad litem* to represent Plaintiff in this matter.  *See id.*  At the end of the day, Duke University's motion to have the Court declare

Plaintiff had realized, from her first year of law school, that Duke Law had in place a system of discrimination, that had been used to discriminate against minorities, particularly black students, for the more than twenty (20) years that black students had attended the school. First Am. Compl. at ¶¶ 35-36, 107. Indeed, as a result of this system of discrimination, black students had been excluded from participation on the school's two most prestigious journals, received lower grades than white students, and had been denied the honors they would otherwise have received if it were not for the system of discrimination. First Am. Compl. at ¶¶ 107-08, 112, 117. The discrimination also had the effect of preventing minorities from obtaining certain jobs considered to be prestigious in the legal profession, like clerkships on the federal appellate and district court level. First Am. Comp. ¶ 111.

As a first year law student at Duke Law, Plaintiff discovered that one of the ways Duke Law facilitated this overall system of discrimination was by lying to students about how to take exams. First Am. Compl. at ¶ 105-06. Specifically, Dean Susan Sockwell, the Dean of Students, intentionally and willfully lied to students about how to take exams, which in turn ensured that they would receive lower grades, making their selection for prestigious journals and their receipt of honors, next to impossible. First Am. Compl. at ¶¶ 106, 113, 117-22. Plaintiff had relied on Dean Sockwell's fraudulent misrepresentation about how to take law school exams, and after receiving her grades, and reviewing other exams, felt she had been injured by the misrepresentation. First Am. Compl. at ¶¶ 124, 127.

Thereafter, because Plaintiff felt that Dean Sockwell's actions were discriminatory, she went to speak to Dean Sockwell about her fraudulent misrepresentations. First Am. Compl. at ¶ 133. Although Dean Sockwell acted as though she did not know her instructions were

---

Plaintiff incompetent and appoint a guardian *ad litem* to represent Plaintiff, which all of the other defendants in this case joined in, consumed almost three (3) years in this litigation.

fraudulent, and that she had made an innocent error, the intentional and willfulness of her acts, and the fact that it was done to facilitate the overall system of discrimination at that school, is evidenced by the fact that after Plaintiff spoke to her, she did absolutely nothing to correct her misrepresentations, and final exams, at that time, were about one (1) month away.  First Am. Compl. at ¶ 136-37.  Plaintiff, who was so disgusted with the racism and bigotry at Duke Law, and other discriminatory acts that she had experienced, decided to e-mail all of the black students who were on the Black Law Students Association e-mail list what she had learned about the taking of law school exams.  First Am. Comp. at ¶ 138.  Though Plaintiff considered suing Duke Law because of the discrimination she experienced during her first year of law school, and even told a classmate about this, she ultimately opted to transfer to Defendant Georgetown University Law Center ("Georgetown Law").  First Am. Compl. at ¶ 139, 32.

However, the Duke Defendants continued to fear that Plaintiff would sue the school because of the discrimination that they had subjected her to, which might in turn have exposed the system of discrimination at the school and also lowered the school's rank on the U.S. News and World Report Law School Rankings.  First Am. Compl. at ¶ 150.  The Dean of Duke Law at the time, Pamela Gann, even told Saundra Dockery, who had supervised Plaintiff when she worked at a work study job during undergrad at Duke, that she would do "anything" to keep the law school in the top ten.  First Am. Compl. at 156.  In fact, the Duke Defendants were so afraid that Plaintiff would file an action against them for discrimination, that they did not just contact Saundra Dockery, but also contacted the Government Defendants, and illegally conspired with the Government Defendants to place Plaintiff under electronic surveillance so they could obtain information to continue to discriminate against Plaintiff, to essentially undermine and discredit

any claim of discrimination that Plaintiff might make against them. First Am. Compl. at ¶¶ 38, 49, 142-43, 147, 178, 186-91.

Indeed, it should be noted that from the outset, the surveillance that Plaintiff has been subjected to, which has included listening devices and video surveillance, was always illegal as there was no basis in law or fact to place Plaintiff under any electronic surveillance. First Am. Compl. at ¶ 48, 54. In fact, the electronic surveillance that Plaintiff has been subjected to was never related to any criminal investigation and at no time was there ever been probable cause to place Plaintiff under any electronic surveillance. First Am. Compl. at ¶52-53. Instead, it was Plaintiff's objection to discriminatory practices at Duke Law that prompted the illegal surveillance that not only allowed the Duke Defendants, the Georgetown Defendants and the Microsoft Defendants to obtain information to discriminate against Plaintiff, but also allowed for private information, including medical information about Plaintiff, to be disseminated to many people. First Am. Compl. at ¶¶ 60, 68-69, 71-72. Although Plaintiff graduated from law school in late May of 2000, the illegal electronic surveillance that she was placed under has continued ever since and has followed Plaintiff no matter where she has lived or where she has went, for more than five (5) years. First Am. Compl. at ¶¶ 32, 38-40, 43-46, 49.

Nevertheless, the Duke Defendants were also so afraid that Plaintiff would sue them for discrimination that they not only illegally placed Plaintiff under electronic surveillance, but also placed one black female student on one of the school's most prestigious journal's, right after Plaintiff transferred from the school, for the first time in the history of the school. First Am. Compl. at ¶ 110. Still, the Duke Defendants were so afraid that Plaintiff would sue them for discrimination that they actually contacted and conspired with persons at Georgetown Law to

adversely affect Plaintiff professionally, personally and academically.  First Am. Comp. at ¶¶ 39,

59-60, 75, 170, 172-73, 175-79, 186-91.

    More specifically, persons at Duke Law contacted and conspired with persons at

Georgetown Law to adversely affect Plaintiff's overall educational experience at Georgetown

Law, including lowering and adversely affecting Plaintiff's grades in a number of courses, as

well as adversely affecting Plaintiff's classroom experience, journal experience and job

prospects.  First Am. Comp. at ¶¶ 147-48, 175-79, 186-91.  Indeed, this conspiracy that existed

between persons at Georgetown Law and Duke Law, and other defendants named herein, was

essentially done to undermine any claim of discrimination that Plaintiff could make against the

Duke Defendants, which was always based on Plaintiff's race, ethnicity and gender.  First Am.

Compl. at ¶¶ 49, 142-43, 147, 178, 186-91.

    In fact, at the end of Plaintiff's second year of law school at Georgetown Law, Plaintiff

had submitted a draft of an article that she had worked on, which involved equal protection

gender jurisprudence, to the *Georgetown Journal of Gender and the Law*, because Plaintiff had

always been interested in issues related to gender.  First Am. Compl. at ¶ 188.  Although Plaintiff

was a third year law student at Georgetown Law at the time the draft was being edited, the draft

was radically changed to include issues on sexuality, and no one ever advised Plaintiff about any

of the changes that were made to the draft.  First Am. Compl. at ¶¶ 189-90.  In fact, even though

Plaintiff had contributed little to the article that was ultimately printed, and she had no

knowledge of the sexuality issues included in the article, Plaintiff's name nevertheless appeared

on the article as though she wrote it.  First Am. Comp. at ¶ 191.  Plaintiff did not even learn

about the changes that had been done to the article until she saw copy of the article, for the first

time, in December of 2001, which was about a year and a half after she had graduated from law

school.  First Am. Compl. at ¶¶ 32, 191.  Still, it should also be noted that during Plaintiff's third

year of law school at Georgetown Law, Plaintiff even had a professor announce, in a civil rights

class that she was taking, that for the first time in all the years that he had been teaching the

class, he was going to include a day on homosexual civil rights issues.  First Am. Compl. at ¶

192.

    Nevertheless, even though Plaintiff graduated from law school in May of 2000, the Duke

Defendants and Georgetown Defendants still continued to interfere with Plaintiff personally and

professionally.  First Am. Compl. at ¶¶ 230-31, 287, 291-92.  Indeed, the Duke Defendants,

Georgetown Defendants, and Government Defendants, have all continued to conspire to keep

Plaintiff under illegal electronic surveillance because they not only want to discriminate against

Plaintiff professionally, which is why the illegal surveillance has existed where Plaintiff has

worked, but also because they also wish to interfere with Plaintiff personally, as they fear that if

Plaintiff is not kept under illegal electronic surveillance Plaintiff could have a relationship with a

man who is both white and wealthy.  First Am. Compl. at ¶¶ 46, 57, 64-65, 292.

    The Microsoft Defendants did not join the conspiracy to discriminate against Plaintiff

until Plaintiff's third year of law school.  First Am. Compl. at ¶ 40.  The Microsoft Defendants

intercepted the illegal electronic surveillance that Plaintiff was being subjected to, and repeatedly

used information they learned from the illegal electronic surveillance to exploit Plaintiff, benefit

themselves financially, and also to harass Plaintiff by putting various things on the company's

MSN website and connecting those things to Plaintiff.  First Am. Compl. at ¶¶  214-20, 223-32,

268-77.

## PROCEDURAL HISTORY

On May 8, 2003, Plaintiff commenced the instant action for damages, discrimination, injunctive and declaratory relief, alleging causes of action arising under the First, Fourth, Fifth, Eight, and Thirteenth Amendments to the United States Constitution, 18 U.S.C. §§ 2510-2522, 20 U.S.C. §§ 1681-1688, 42 U.S.C. § 1981, 42 U.S.C. § 1985, 42 U.S.C. § 1986, and 42 U.S.C. §§ 2000d-2000d-7.  First Am. Compl. at ¶¶ 303-27.  Plaintiff also sought relief for state and territorial causes of action, including fraud, civil conspiracy, intentional infliction of emotional distress, invasion of privacy, interference with prospective advantage, and theft of intellectual property.  First Am. Compl. at ¶¶ 294-302, 328-42.   Plaintiff also requested punitive damages because the outrageous acts these Defendants have committed have been so illegal and have been done with such callous disregard for Plaintiff's rights.  First Am. Compl. at ¶¶ 343-44.  The Complaint was amended on June 5, 2003 to include the Microsoft Defendants (including Defendant Melinda Gates), and Defendant John Ashcroft, who has since been substituted by Alberto Gonzales.  *See* First Am. Compl.; V.I. Docket at 156.

After being served with Plaintiff's Complaint, the first thing Duke University did was to file a Motion for Enlargement of Time and for Initial Status Conference wherein they moved the Court to consider employing Rule 17(c) procedures in this case based on the discriminatory acts Plaintiff alleged that they had committed against her.  V.I. Docket at 55. Thereafter, the Duke Defendants further submitted a report by Dr. Rita Dudley-Grant, a psychologist, wherein Dr. Dudley-Grant, based on her opinion of the allegations in Plaintiff's Complaint, concluded that Plaintiff might be experiencing paranoid schizophrenia or a delusional disorder.  The other defendants in this case all joined in this motion.  *See* V.I. Docket at 53, 58.

Even though, from the outset, Plaintiff argued that the defendants in this case had misconstrued the law, and that Plaintiff's competency would have to be determined based on whether or not Plaintiff was able to protect her own interests, and whether she was able to understand the meaning and effect of the proceedings in this case, Magistrate Judge Jeffrey Resnick rejected Plaintiff's arguments. Instead, based on arguments by the defendants and the conclusions submitted by Dr. Dudley-Grant, Magistrate Judge Resnick ordered Plaintiff to be examined by Dr. Olaf Hendricks to determine her competency to prosecute the matter and whether the text of her complaint demonstrated "delusional psychosis, paranoid schizophrenia, or any other mental illness of abnormality." V.I. Docket at 60. Dr. Hendricks then submitted a report, which concluded, based on his personal opinion of the allegations in Plaintiff's Complaint, that Plaintiff was suffering from a delusional disorder and was therefore incapable of prosecuting this matter. Plaintiff then retained her own expert, Dr. Steven Handwerker, who opined that Plaintiff's mental health was good and stable despite the sorts of stress that the defendants in this case had subjected her to.[3] V.I. Docket at 72, Ex. 1.

Thereafter, despite Plaintiff's continued arguments that the defendants had misconstrued the law, and Plaintiff's own expert report which stated that her mental health was good and stable, Magistrate Judge Resnick, relying on Dr. Hendricks and Dr. Dudley-Grant's reports,

---

[3] Plaintiff's expert, Dr. Steven Handwerker, was a licensed psychologist from the state of Florida, who was also licensed in New York and South Dakota. *See* Curriculum Vitae of Dr. Steven Handwerker, V.I. Docket at 72, Ex. 2. He obtained his doctorate in psychology from New York University, and his post doctoral certification in clinical psychology from Hofstra University. *See id.* He served as the Director of Psychological Services at the Holistic Health Center (now called the New Center for Holistic Education and Research) in Manhasset, New York, from 1978-1988, before starting his private clinical practice. *See id.* He has authored a number of publications, and has given many presentations. *See id.* He was a board certified expert in traumatic stress, and was also board certified in forensic medicine and as a forensic examiner. *See id.*

decided to go ahead and appoint a guardian *ad litem* to represent Plaintiff in this case.  The

District Court Judge Thomas Moore affirmed his decision.  Docket at 129.  Plaintiff then

appealed both of these erroneous decisions to the Court of Appeals for the Third Circuit, and the

Third Circuit **vacated** the District Court's Order.  *See Richards*, 2006 WL 162652 at *3.  In

vacating the District Court's Order, the Third Circuit held that the District Court had abused its

discretion because it failed to apply the correct standard to determine whether a guardian *ad*

*litem* could be appointed, which is whether a person is capable of taking care of themselves, or,

put another way, whether a person is capable of protecting their own interests, and understanding

the meaning and effect of the legal proceedings they have instituted.[4]  *See id.*  In addition, in

vacating the District Court's Order, the Third Circuit also rejected the conclusions that Dr.

Hendricks had reached, which had resulted from Magistrate Judge Resnick's misapplication of

the law, and instead concluded, after reviewing information in the record, that Plaintiff was

competent to proceed *pro se*.  *See id.*  The Third Circuit then remanded this matter to the District

Court.

On remand, the defendants were given until May 8, 2006 to answer or otherwise respond

to Plaintiff's Complaint.  V.I. Docket at 182.  Thereafter, Defendant Georgetown University

moved to have this matter transferred to the District of Columbia and the District Court in the

Virgin Islands granted its request.  V.I. Docket at 205.  Although the Duke Defendants, like the

---

[4] The Third Circuit did also hold that the District Court had abused its discretion because it failed to make any factual findings to support its decision to appoint a guardian *ad litem*.  *See Richards*, 2006 WL 162652 at 3 (stating "[w]e conclude that the District Court abused its discretion in appointing a guardian ad litem because it did not apply the correct legal standard or make any factual findings to support such a decision").  Indeed, the Third Circuit, in rendering its decision, noted that the Magistrate Judge, in appointing a guardian *ad litem*, had failed to make any explicit factual findings to support his decision, and the District Court, in affirming the Magistrate's decision, simply stated, without further explanation, that he was doing so because of the reasons given by the defendants in their oppositions.  *Id.*

other defendants in this case, invoked the subject-matter jurisdiction of the court to attempt to have Plaintiff declared incompetent, so a guardian *ad litem* could be appointed to represent her, it has nevertheless now moved to dismiss this action, pursuant to Rule 12(b)(1), for lack of subject matter jurisdiction, or in the alternative, pursuant to what they and Defendant Georgetown University have called "the Court's inherent authority under Rule 12(b)(6)". Georgetown Univ.'s Mem. of Law at 2; Duke Defs. Mem. of Law at 3. Plaintiff now opposes this motion.

## STANDARD OF REVIEW

### 1. RULE 12(B)(1) STANDARD

"On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction." *Hilska v. Jones*, 297 F. Supp. 2d 82, 86 (D.D.C. 2003). However, "[t]he court may dismiss a complaint for lack of subject-matter jurisdiction only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief'." *Id.* (citing *Empagram S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

"Because subject-matter jurisdiction focuses on the court's power to hear the claim, . . . the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim." *Hilska*, 297 F. Supp. 2d at 87 (citing *Macharia v. United States*, 334 F.3d 61, 64, 60 (D.C. Cir. 2003) and *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). However, the court is not limited to the allegations in the complaint, and instead, may consider matters outside the pleadings, to determine whether it has subject-matter jurisdiction over the claim. *Hilksa*, 297 F. Supp. 2d at 87 (citing *Hohri v. United States*, 782 F.2d 227, 241

(D.C. Cir. 1986) *vacated on other grounds*, 482 U.S. 64 (1987) and *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## 2. RULE 12(B)(6) STANDARD

"On a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must construe the allegations and facts in the complaint in the light most favorable to the plaintiff and must grant the plaintiff the benefit of all inferences that can be derived from the alleged facts." *Hopkins v. Women's Division General Board of Global Ministries*, 238 F. Supp. 2d 174, 177 (D.D.C. 2002) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1975)) (citation omitted). "However, the Court need not accept inferences or conclusory allegations that are unsupported by the facts set forth in the complaint." *Hopkins*, 238 F. Supp. at 178. "In deciding whether to dismiss a claim under Rule 12(b)(6), the Court is able to only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Id.* "The Court will dismiss a claim pursuant to Rule 12(b)(6) only if the defendant can demonstrate 'beyond a reasonable doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief'." *Id.*

## ARGUMENT

## I.    PLAINTIFF'S CLAIMS ARE NOT PATENTLY INSUBSTANTIAL

"Federal courts have subject-matter jurisdiction over a claim arising under federal law regardless of the plausibility of the plaintiff's allegations." *Hilksa*, 297 F. Supp. 2d at 87 (citing *Equal Employment Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 623 (D.C. Cir. 1997) and *Smith v. Horner*, 846 F.2d 1521, 1523 (D.C. Cir. 1988)). However, a court may, in its discretion, dismiss a claim that is patently insubstantial for lack of subject matter

jurisdiction pursuant to Rule 12(b)(1).  *Hilksa*, 297 F. Supp. 2d at 87; *Hagans v. Lavine*, 415 U.S. 528, 536 (1974) (stating that "federal courts are without power to entertain claims otherwise within their jurisdiction if they are 'so attenuated and unsubstantial as to be absolutely devoid of merit'"); *Bell v. Hood*, 327 U.S. 678, 682-83 (1946) (noting that a federal claim may be dismissed for lack of subject matter jurisdiction where it "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous").

Courts have defined patently insubstantial claims to be those that are based on factual allegations which involve fantastic scenarios that rise to the level of being irrational or wholly incredible.  *Hilksa*, 297 F. Supp. 2d at 88; *Best v. Kelly*, 39 F.3d 328, 330-31 (D.C. Cir. 1994) (describing, as frivolous, a complaint where the plaintiff alleged that "a Secret Branch of the Federal Government" had taken his face off of his head and then went into his skull to place a computer chip and camera system which made him project images many feet in front of him); *Bestor v. Lieberman*, No. Civ. A. 03-1470(RWR), 2005 WL 681460 (D.D.C. Mar. 11, 2005) (dismissing, as frivolous, a complaint where the plaintiff alleged that "a system of neuroprosthetics was implanted in his skull and brain" which allegedly allowed "human operators" the ability to "induce image and audio sequences in [the] plaintiff's brain"). However, "[n]ot qualifying as frivolous are claims that are implausible, namely those that are doubtful or of questionable merit."  *Hilksa*, 297 F. Supp. 2d at 87-89 (citing *Goosby v. Osser*, 409 U.S. 512, 518 (1973) and *Best*, 39 F.3d at 330-31).

Of course, even though claims may not be considered patently insubstantial pursuant to Rule 12(b)(1), they may nevertheless warrant dismissal pursuant to Rule 12(b)(6) for failure to

state a claim upon which relief may be granted. *Id.* at 88. As the Supreme Court explained in *Bell v. Hood*,

> Jurisdiction. . . is not defeated . . . by the possibility that the averments might fail to state a cause of action. . . For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.

372 U.S. at 682, *quoted in Hilksa*, 297 F. Supp. 2d at 88.

In the case *sub judice*, Plaintiff has alleged that she was discriminated against while she was a first year law student at Duke Law. First Am. Compl. at ¶¶ 35-38, 105-46. Plaintiff has further alleged that although Plaintiff transferred to Georgetown Law, the Duke Defendants nevertheless contacted and conspired with persons at Georgetown Law to continue to discriminate against Plaintiff to adversely affect her professionally, personally and academically. First Am. Comp. at ¶¶ 39, 59-60, 75, 170, 172-73, 175-79, 186-91. More specifically, Plaintiff has alleged that persons at Duke Law conspired with persons at Georgetown Law to adversely affect Plaintiff's overall educational experience at Georgetown Law, including lowering and adversely affecting Plaintiff's grades in a number of courses, as well as adversely affecting Plaintiff's classroom experience, journal experience and job prospects. First Am. Comp. at ¶¶ 147-48, 175-79, 186-91. Plaintiff has alleged that the discriminatory acts that Plaintiff was subjected to was because of her race, ethnicity and gender. First Am. Compl. at ¶ 293.

None of these allegations are attenuated, implausible or patently insubstantial as Courts routinely exercise subject matter jurisdiction over these sorts of claims and further reach the merits of disputes that involve these sorts of claims, as the claims simply involve discrimination

that is alleged to have been committed by educational institutions. *See e.g., Phillip v. University of Rochester*, 316 F.3d 291 (2d Cir. 2003); *Williams v. Lindenwood University*, 288 F.3d 349 (8th Cir. 2002); *Tripp v. Long Island University*, 48 F. Supp. 2d 220 (E.D.N.Y. 1999). In fact, it should be noted that when a complaint raises claims under the Civil Rights Statutes, as is the case here, the more judicious approach is for a court to assume jurisdiction and then decide whether the complaint states a claim for which relief can be granted. *Stambler v. Dillon*, 302 F. Supp. 1250, 1252 (S.D.N.Y. 1969).

Further, Plaintiff has alleged claims that are related to the use of illegal electronic surveillance because one of the ways that the defendants facilitated the discrimination that Plaintiff has been subjected to, both while she was in law school and after she left, was with the use of illegal electronic surveillance. First Am. Compl. at ¶¶ 38-42, 46, 292. However, there is nothing attenuated, implausible or patently insubstantial about these claims, as this court has already found allegations related to the extensive use of illegal electronic surveillance to be justiciable. In *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144 (D.D.C. 1976), the plaintiffs, which included the Berlin Democratic Club, which among other activities, had supported the impeachment proceedings against President Nixon in 1973, brought an action against a number of Department of Defense Army officials and uniformed personnel. The plaintiffs alleged, among other things, that they had been subjected to numerous acts of warrantless electronic surveillance, and that the defendants had maintained "dissidence identification" files and "blacklists" about them which had been disseminated to military and civilian agencies and private citizens. *Id.* at 147. The plaintiffs alleged that the defendants had wiretapped their telephones, disrupted their daily activities, and that the derogatory information that had been disseminated lead to the termination or restriction of their employment

opportunities or forced them to severely restrict their activities for fear of having additional

information disseminated. *Id.* at 148. Although the Complaint was filed in 1974, the plaintiffs

alleged that the illegal surveillance had extended as far back as 1971, and had continued, in all

instances, for at least a period of months. *Id.* at 148, 161.

Ultimately, in *Berlin Democratic Club*, the court held that the action was justiciable

because "public dissemination of . . . information in a false and defamatory manner and with no

lawful purpose, disruption of legitimate activities, termination of employment, illegal electronic

surveillance, and other forms of harassment" were properly subject to challenge as being beyond

legitimate surveillance activities. *Id.* at 151; *see also Philadelphia Yearly Meeting of the*

*Religious Society of Friends v. Tate*, 519 F.2d 1335, 1338 (3d Cir. 1975) ("It is not apparent how

making information concerning the lawful activities of plaintiffs available to non-police groups

or individuals could be considered within the proper ambit of law enforcement activity,

particularly since it is alleged that plaintiffs are subject to surveillance only because their

political views deviate from the 'establishment'. We think these allegations, at a minimum,

show immediately threatened injury to plaintiffs by way of a chilling of their rights of freedom of

speech and associational privacy.")

Furthermore, this court has already held that it had subject-matter jurisdiction where there

were allegations of extensive acts of wrongdoing by a number of people. In *Hilksa v. Jones*, 297

F. Supp. 2d 82 (D.D.C. 2003), the plaintiff, who was a native and citizen of Finland, brought an

action against a number of federal, private and foreign defendants. *Id.* at 84. The federal

defendants included President George W. Bush, Attorney General John Ashcroft, Senator Hillary

Clinton, former President Bill Clinton, and Judy Thomas, a deportation officer with the

Immigration and Naturalization Service. *Id.* at 84 n.2. The private defendants included Pierre

Sané and Boisfeuillet Jones, Jr.  *Id.*  The foreign defendants included Substitute for Consul

Kimmo Nikkanen of Finland, Minister of Justice Heinrich Koller of Switzerland, Minster of

Justice Marylise Lebranchu of France, Attorney General Hans Regner of Sweden, former Finnish

Presidents Mauno Koivisto and Marti Ashtisaari, and the current Finnish President Tarja

Halonen.  *Id.*

      In *Hilksa*, the plaintiff alleged that the defendants had wrongfully prevented him from

obtaining political asylum in the United States by committing a number of illegal acts.  *Id.* at 83.

More specifically, the plaintiff alleged that the federal defendants were responsible for a number

of offenses, which included forgery, extortion, assault, destruction of documents, torture, and

attempted murder.  *Id.* at 84.  In addition, the plaintiff alleged that Senator Hillary Clinton and

former President Bill Clinton had broken into his luggage and stolen its contents while he was at

a local airport.  *Id.* at 89.  The plaintiff further alleged that the federal defendants had instructed a

detention center to give him medication that caused him to have "a splitting headache, strong

pain in his urinary tract and intense tumefaction in [his] feet."  *Id.*  The plaintiff also alleged that

because of instructions that were given by the federal defendants, he was kept "'seriously injured

in [a] cold cell for killing purposes' from November 30, 1999 through July 14, 2000."  *Id.*

Throughout his complaint, and other filings, the plaintiff also accused various individuals of

"tightening up his situation."  *Id.*

      While the court in *Hilksa* did note that the plaintiff's allegations may be implausible, the

court nevertheless concluded that the allegations did not qualify as "frivolous" for purposes of

Rule 12(b)(1).  *Id.*  Indeed, the court specifically stated that the "doubtful nature of the plaintiff's

claims [would] not defeat the court's jurisdiction."  *Id.*  Accordingly, the court denied a motion

to dismiss for lack of subject matter jurisdiction that had been filed by the federal defendants.

Nevertheless, the Duke Defendants, in adopting the arguments that have been submitted by Georgetown University, have primarily relied on two cases, *O'Connor v. United States*, 159 F.R.D. 22 (D. Md. 1994) and *Carone-Ferdinand v. Central Intelligence Agency*, 131 F. Supp. 2d 232 (D.D.C. 2001), to support their claims that Plaintiff's Complaint should be dismissed for lack of subject matter jurisdiction. *See* Georgeotown Univ.'s Mem. of Law at 13-18; Duke Defs Mem. of Law at 3. However, both of these cases are easily distinguishable from the case at bar. In *O'Connor*, the plaintiff did allege that he was placed under an extensive amount illegal surveillance which would clearly be actionable under the Fourth Amendment to the Constitution and 18 U.S.C. § 2520. *See id.* at 23-24. However, the plaintiff in *O'Connor* went further, apparently alleging that the U.S. Drug Enforcement Administration ("DEA") had enlisted the help of a large number of civilians to speak to him in buzz words like "no way", "can't win", and "I'll show you", and that the civilians further displayed props. *Id.* at 24. Indeed, the plaintiff alleged that "he rarely goes into a store or restaurant, walks for a few blocks, or gets on the subway 'without being imposed upon by the presence of several civilian volunteers chattering away with DEA-prepared dialogue." *Id.* According to the plaintiff in *O'Connor*, a license plate with the letters "TNT" meant he was "playing with dynamite". *Id.* The Plaintiff also alleged that the DEA had contacted stores and restaurants, "which then play music over the PA systems in an effort to control the environment around him and convince him that resistance is hopeless." *Id.*

In *O'Connor*, the court, relying primarily on the allegations regarding the use of the DEA-prepared dialogue, the props, like a license plate with the letters "TNT", and the playing of music in a stores, i.e. ordinary conversations and encounters, led her to conclude that the plaintiff's claims were divorced from the real world and therefore frivolous for purposes of Rule 12(b)(1).

*Id.* at 25.  Needless to say, in the case *sub judice*, Plaintiff certainly has not alleged that the Duke

Defendants have conspired with civilians to speak to her with props and buzz words, and she

certainly has not alleged that license plates, regardless of the letters, or for that matter, the

playing of music in stores and restaurants, are really part of some government sponsored plot to

harass her.

Nevertheless, in *Carone-Ferdinand*, the plaintiffs claimed that the defendants had stolen

insurance policies, bank accounts, and other property that had belonged to Mr. Albert Carone,

because of Mr. Carone's participation in government sanctioned illegal activity that had spanned

some sixty (60) years.  *See Carone-Ferdinand*, 131 F. Supp. 2d at 233.  According to the

plaintiffs, Mr. Carone had the dual status of a "made" member of the Genovese Crime family,

and a New York Police Department detective, when he was recruited by the Central Intelligence

Agency ("CIA").  *Id.*  The plaintiffs claimed that on direct orders from the CIA, Mr. Carone

imported cocaine into the United States for over 40-odd years, with the profits going to "CIA-

sanctioned, covert, anti-communist activities."  *Id.*  The plaintiffs further claimed that Mr.

Carone's duties with the CIA did not just include drug trafficking, but also orders to assassinate

President John F. Kennedy, as well as orders to destroy "an entire village of men, women, and

children."  *Id.*  The court dismissed the complaint for lack of subject matter jurisdiction as it

concluded that the allegations were essentially fictitious.  *Id.* at 235.

Needless, to say, Plaintiff has not alleged that she was recruited by the CIA to traffick

drugs, or to assassinate individuals and wipe out villages of men, women and children, such that

the defendants would want to steal property that belonged to her.  Instead, Plaintiff has filed her

Complaint because of outrageous acts of discrimination that she has been subjected to for a more

than five year period of time, which began while she was in law school, and which has

continued, with the use of illegal electronic surveillance, since she graduated from law school. In addition, while the illegal electronic surveillance that Plaintiff has been subjected to has been configured in a way that allows many people to illegally intercept private information about Plaintiff, First Am. Compl. at ¶¶ 47, 69, Plaintiff has only sued the defendants that are named herein because they are the ones that have been responsible for placing and keeping her under illegal electronic surveillance. First Am. Compl. at ¶¶ 38-46.

Nevertheless, the most troubling thing about the Duke Defendants motion is that they have actually referred to the allegations in Plaintiff's Complaint as "ludicrous" even though none of the Duke Defendants have ever denied that there was a conspiracy to discriminate against Plaintiff or that they committed acts in furtherance of the conspiracy. Indeed, in the case *sub judice*, Ms. Kate Hendricks has proffered a Declaration, under penalty of perjury, on behalf of Duke University, Duke Law, and the Duke Board of Trustees, that does not address any of the allegations that relate to the discrimination that Plaintiff experienced while she was in law school or the illegal electronic surveillance that was used to facilitate that discrimination.[5]  *See* D.C.

---

[5]  Although the Declaration proffered by Ms. Hendricks does not address any of the allegations that relate to the discrimination that Plaintiff experienced or the illegal electronic surveillance that she was subjected to, it does nevertheless attempt to dispute certain allegations that Plaintiff has made in her Complaint. Plaintiff has alleged that the Duke University Board of Trustees is comprised of thirty-six (36) elected members **and** the President of Duke University, *ex officio*. First Am. Compl. at ¶ 6. Indeed, if this Court were to go to Duke University's website, which is located at www.duke.edu, and click on the link entitled "About Duke", and then click on the link entitled "Board of Trustees", this Court would find that there are actually thirty-seven (37) members of the Board – thirty-six (36) of whom are presumably the elected members and Dr. Richard Brodhead, who is currently the President of Duke. *See* Ex. 1. In fact, according to Duke University's website, Dr. Brodhead is even a member of the Board's Executive Committee. *See id.* Nevertheless, despite this, Ms. Hendricks has represented that the Board of Trustees is comprised of thirty-six elected members. *See* D.C. Docket 18, at Ex. 1. It is unclear why Ms. Hendricks has neglected to mention that the President of the University is also a member of the Board of Trustees. In addition, Plaintiff has alleged that Melinda Gates sat on the Board of Trustees for the entire time that Plaintiff was discriminated against by the Duke Defendants, the Georgetown Defendants and the Government Defendants. First Am. Compl. at ¶ 197. In fact,

Docket at 18, Ex. 1.  In fact, even though it has been more than three (3) years since the Complaint in this matter was filed, there is nothing in Ms. Hendricks' Declaration that indicates that anyone at Duke has even investigated any of the allegations in Plaintiff's Complaint. Indeed, even if Duke, Duke Law, and the Duke University Board of Trustees were to now try to deny the allegations, it does not appear that they would be able to proffer a basis for the denial, like a showing of any investigation, including the nature and scope thereof, that they undertook in this matter.

Similarly, Defendant Nannerl Keohane has also utterly failed to address any of the allegations that relate to the discrimination that Plaintiff experienced in law school or the use of illegal surveillance to facilitate the discrimination.  In fact, Defendant Keohane does not deny that she was aware of a conspiracy to discriminate against Plaintiff or that she was a part of that conspiracy.  More specifically, Defendant Keohane does not deny that she knew that Plaintiff was discriminated against while she was a first year law student at Duke Law or that after Plaintiff transferred to Georgetown Law, persons at Duke Law contacted persons at Georgetown Law and the purpose of the contacts was to discriminate against Plaintiff and adversely affect her academically, professionally and personally.  Indeed, Defendant Keohane does not even deny that persons at Duke Law contacted the Government Defendants to illegally place Plaintiff under electronic surveillance to obtain information to discriminate against Plaintiff.  In fact, Defendant Keohane has not denied receiving information about Plaintiff from the illegal electronic surveillance or even using information from the surveillance to discriminate against Plaintiff.

---

the Microsoft Defendants have confirmed that Melinda Gates served on the Board of Trustees from 1996 through 2003.  *See* V.I. Docket at 220, Microsoft Defs.' Mem. of Law at 3 n. 2  As such, in light of the fact that Melinda Gates, and others, like former President Keohane, have served on the Board of Trustees for more than two years, it is unclear what Ms. Hendricks meant when she said that the Board's "membership changes every two years."  D.C. Docket 18, at Ex. 1.  Indeed this statement, taken literally, would seem to fly in the face of the record in this case.

The simple fact of the matter is that no one is above the law, and that includes the Duke Defendants.  Where, as here, Plaintiff's rights have been continuously violated by the defendants in this case, she is entitled to recover relief in a court of law.  *See Marbury v. Madison*, 1 Cranch 137, 163 (1803) (stating "[i]f [a person] has a right, and that right has been violated, do the laws of this country afford [that person] a remedy", as "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.").  Accordingly, for all of the reasons stated herein, the Duke Defendants' motion to dismiss this case pursuant to Rule 12(b)(1) must be denied.

## II.    THERE IS NO BASIS TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO RULE 12(b)(6) OR THIS COURT'S INHERENT AUTHORITY

The Duke Defendants have joined in Georgetown University's motion to have this Court, in the alternative, dismiss this action pursuant to what they have called "the Court's inherent authority under Fed. R. Civ. P. 12(b)(6)".  *See* Georgetown University's Mem. of Law at 17; Duke Defs. Mem. of Law at 3.  However, the cases that the Duke Defendants are relying on do not support the relief that they are requesting.  *See Tate v. Burke*, 131 F.R.D. 363 (D.D.C. 1990) (invoking court's inherent authority to dismiss, *sua sponte*, a complaint as being without any factual and legal basis where the plaintiff alleged that the president of CBS had televised her in her home on a candid camera for over ten years, and that she had become aware of these acts because "God [had] slipped all this information into [her] mind"); *Brown v. District of Unemployment Comp. Bd.*, 411 F. Supp. 1001 (D.D.C. 1975) (denying motion to reconsider dismissal of complaint as the district court had the inherent authority to dismiss case *sua sponte*); *Robinson v. Love*, 155 F.R.D. 535, 536 (E.D. Pa. 1994) (dismissing complaint pursuant to 28 U.S.C. § 1915 as frivolous).

Indeed, none of the cases even involve a dismissal that was done pursuant to Rule 12(b)(6). Further, the Duke Defendants have not otherwise attempted to in any way show that Plaintiff has failed to state a claim upon which relief may be granted, such that it would be entitled to a dismissal pursuant to Rule 12(b)(6). As such, to the extent that the Duke Defendants are moving this Court to dismiss Plaintiff's complaint pursuant to Rule 12(b)(6) it must be denied.

In addition, to the extent the Duke Defendants are asking this Court to invoke its inherent authority to dismiss Plaintiff's Complaint, as the Court did in *Tate* and *Brown*, this request must be denied as well. "[T]he inherent power enables courts to protect their institutional integrity and to guard against abuses of the judicial process with contempt citations, fines, awards of attorneys' fees, and such other orders and sanctions as they find necessary, including even dismissals and default judgments." *Shepherd v. American Broadcasting Companies*, 62 F.3d 1469, 1473 (D.C. Cir. 1995). However, "because inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Id.* at 1475. Indeed, the Supreme Court has "cautioned restraint in the use of inherent powers '[b]ecause of their very potency'." *Id.* (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991)).

Here, there is no basis for this Court to invoke its inherent authority to dismiss Plaintiff's Complaint. Indeed, Plaintiff's Complaint has both a factual and legal basis, and the Duke Defendants have not demonstrated otherwise. Further, Plaintiff has certainly not filed her Complaint for any improper purpose, such as harassing the defendants, and the Duke Defendants have not and can not demonstrate otherwise. As such, it is clear that the Duke Defendants' request to have this Court invoke its inherent authority to dismiss this case must be denied.

**<u>CONCLUSION</u>**

Accordingly, for all the foregoing reasons, the Duke Defendants' Motion to Dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6) should be denied in its entirety.


Respectfully submitted,
ATTORNEY FOR PLAINTIFF,


DATED: August 25, 2006                 _____

Suzette Richards, Esquire, *Pro Se*
P.O. Box 223875
Christiansted, St. Croix  00822-3875
Telephone: (340) 277-4808
Fax: (340) 772-5785

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of August, 2006, a true and exact copy of the foregoing document was caused to be served via electronic notification upon:

Simone R. D. Francis, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, L.L.C.
The Tunick Building, Suite 202
1336 Beltjen Road
St. Thomas, U.S. Virgin Islands  00802
Simone.francis@ogletreedeakins.com

Michael J. Murphy, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
2400 N Street, N.W., Fifth Floor
Washington, D.C. 20037
Michael.murphy@odnss.com

Henry Feuerzeig, Esq.
Dudley, Topper & Feuerzeig
1A Frederiksberg Gade
P.O. Box 756
St. Thomas, V.I. 00804
hfeurzeig@dtflaw.com

Charles E. Buffon, Esq.
Harry B. Roback, Esq.
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
cbuffon@cov.com
hroback@cov.com

Richard Hunter, Esq.
Hunter, Cole & Bennett
Pentheny Bld., 3rd Floor
1138 King Street, Suite 301
Christiansted, St. Croix  00820
rhunter@hcbvilaw.com

Elizabeth O'Brien, Esq.
Williams & Connolly LLP
725 Twelfth Street
Washington, D.C. 20002
eobrien@wc.com

Benton G. Peterson, Esq.
Assistant United States Attorney
Judiciary Center Building
Civil Division
555 4th St., N.W., Room E4905
Washington, D.C. 20530
Benton.peterson@usdoj.gov

_____/s/_____
Suzette Richards, *Pro Se*