# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SUZETTE RICHARDS, | ) | |
| | ) | |
| PLAINTIFF, | ) | CIVIL NO. 06-01179 (RCL) |
| | ) | |
| v. | ) | ACTION FOR DAMAGES, |
| | ) | DISCRIMINATION, AND |
| DUKE UNIVERSITY, DUKE UNIVERSITY | ) | DECLARATORY AND |
| SCHOOL OF LAW, DUKE UNIVERSITY | ) | INJUNCTIVE RELIEF |
| BOARD OF TRUSTEES, NANNERL | ) | |
| KEOHANE, in her personal and official | ) | |
| Capacity as President of Duke University, | ) | |
| GEORGETOWN UNIVERSITY, | ) | |
| GEORGETOWN UNIVERSITY LAW CENTER, | ) | |
| ALBERTO GONZALES, in his official capacity | ) | |
| as Attorney General of the United States, | ) | |
| FEDERAL BUREAU OF INVESTIGATION, | ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) | **JURY TRIAL DEMANDED** |
| JOHN AND JANE DOES 1-10, | ) | |
| WILLIAM H. GATES, III, in his personal and | ) | |
| official capacity as Chairman of Microsoft | ) | |
| Corporation, STEVE BALLMER, in his personal | ) | |
| and official capacity as Chief Executive Officer | ) | |
| of Microsoft Corporation, MICROSOFT | ) | |
| CORPORATION, MICROSOFT EMPLOYEES | ) | |
| A-J, and MELINDA GATES, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| —————————————————————— | ) | |

## PLAINTIFF'S OPPOSITION TO THE DUKE DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(2) AND PLAINTIFF'S CROSS MOTION FOR LEAVE TO TAKE JURISDICTIONAL DISCOVERY

**COMES NOW**, Plaintiff, *pro se*, and hereby respectfully opposes Defendants Duke University, Duke University School of Law, Duke University Board of Trustees, and Nannerl Keohane's (collectively "Duke Defendants") Motion to Dismiss that was brought pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure and further moves this Court for leave to take jurisdictional discovery.

## **FACTUAL BACKGROUND**

Plaintiff's Complaint against the Duke Defendants stems from the discrimination she experienced while she was in law school.  Plaintiff had realized, from her first year of law school, that Duke Law had in place a system of discrimination, that had been used to discriminate against minorities, particularly black students, for the more than twenty (20) years that black students had attended the school.  First Am. Compl. at ¶¶ 35-36, 107.  Indeed, as a result of this system of discrimination, black students had been excluded from participation on the school's two most prestigious journals, received lower grades than white students, and had been denied the honors they would otherwise have received if it were not for the system of discrimination.  First Am. Compl. at ¶¶ 107-08, 112, 117.  The discrimination also had the effect of preventing minorities from obtaining certain jobs considered to be prestigious in the legal profession, like clerkships on the federal appellate and district court level.  First Am. Comp. ¶ 111.

As a first year law student at Duke Law, Plaintiff discovered that one of the ways Duke Law facilitated this overall system of discrimination was by lying to students about how to take exams.  First Am. Compl. at ¶ 105-06.  Specifically, Dean Susan Sockwell, the Dean of Students, intentionally and willfully lied to students about how to take exams, which in turn ensured that they would receive lower grades, making their selection for prestigious journals and their receipt of honors, next to impossible.  First Am. Comp. at ¶¶ 106, 113, 117-22; Ex. 1, Decl. at ¶ 7.  Plaintiff had relied on Dean Sockwell's fraudulent misrepresentation about how to take law school exams, and after receiving her grades, and reviewing other exams, felt she had been injured by the misrepresentation.  First Am. Compl. at ¶¶ 124, 127; Ex. 1, Decl. at ¶¶ 8-10.

Thereafter, because Plaintiff felt that Dean Sockwell's actions were discriminatory, she went to speak to Dean Sockwell about her fraudulent misrepresentations. First Am. Compl. at ¶ 133; Ex. 1, Decl. at ¶ 10. Although Dean Sockwell acted as though she did not know her instructions were fraudulent, and that she had made an innocent error, the intentional and willfulness of her acts, and the fact that it was done to facilitate the overall system of discrimination at that school, is evidenced by the fact that after Plaintiff spoke to her, she did absolutely nothing to correct her misrepresentations, and final exams, at that time, were about one (1) month away. First Am. Compl. at ¶ 136-37; Ex. 1, Decl. at ¶¶ 11-12. Plaintiff, who was so disgusted with the racism and bigotry at Duke Law, and other discriminatory acts that she had experienced, decided to e-mail all of the black students who were on the Black Law Students Association e-mail list what she had learned about the taking of law school exams.[1] First Am. Compl. at ¶ 138; Ex. 1, Decl. at ¶ 13. Though Plaintiff considered suing Duke Law because of the discrimination she experienced during her first year of law school, and even told a classmate about this, she ultimately opted to transfer to Defendant Georgetown University Law Center ("Georgetown Law"). First Am. Compl. at ¶ 139, 32; Ex. 1, Decl. at ¶¶ 14, 16.

---

[1] It should be noted that Plaintiff had had other experiences during her first year of law school at Duke Law that were rooted in bigotry and discrimination. For example, during the first semester of Plaintiff's first year of law school, Plaintiff's Contracts professor made statements, during one class, that implied that Plaintiff was a citizen of a foreign country when Plaintiff is actually a citizen of the United States. First Am. Compl. at ¶ 130; Ex. 1, Decl. at ¶ 5. Indeed, later on, during Plaintiff's first semester, this same professor, who is white, even told Plaintiff, in an attempt to make himself appear superior to Plaintiff, that his wife, who is also white, was a direct descendant of the Pilgrims that came over on the Mayflower back in the 1600's. First Am. Compl. at ¶ 131; Ex. 1, Decl. at ¶ 6. Of course, while Plaintiff would note that she has nothing against persons who are descendants of the Pilgrims, she would nevertheless submit that it is unlikely that minorities who go to Duke Law, which would include Blacks, Hispanics, Asians, and Native Americans, to the extent any Native Americans have ever attended that school, would have that sort of family background.

However, the Duke Defendants continued to fear that Plaintiff would sue the school because of the discrimination that they had subjected her to, which might in turn have exposed the system of discrimination at the school and also lowered the school's rank on the U.S. News and World Report Law School Rankings. First Am. Compl. at ¶ 150. The Dean of Duke Law at the time, Pamela Gann, even told Saundra Dockery, who had supervised Plaintiff when she worked at a work study job during undergrad at Duke, that she would do "anything" to keep the law school in the top ten.[2]  First Am. Compl. at 156; Ex. 1, Decl. at ¶ 15. In fact, the Duke Defendants were so afraid that Plaintiff would file an action against them for discrimination, that they did not just contact Saundra Dockery, but also contacted the Government Defendants, and illegally conspired with the Government Defendants to place Plaintiff under electronic surveillance so they could obtain information to continue to discriminate against Plaintiff, to essentially undermine and discredit any claim of discrimination that Plaintiff might make against them. First Am. Compl. at ¶¶ 38, 49, 142-43, 147, 178, 186-91.

Indeed, it should be noted that from the outset, the surveillance that Plaintiff has been subjected to, which has included listening devices and video surveillance, was always illegal as there was no basis in law or fact to place Plaintiff under any electronic surveillance. First Am. Compl. at ¶ 48, 54. In fact, the electronic surveillance that Plaintiff has been subjected to was never related to any criminal investigation and at no time was there ever been probable cause to place Plaintiff under any electronic surveillance. First Am. Compl. at ¶52-53. Instead, it was

---

[2] At the end of Plaintiff's first year of law school, another first year law student had even told Plaintiff that persons at Duke Law were paranoid about the law school's rank in the U.S. News and World Report. First Am. Compl. at ¶ 151. According to this student, when the law school had slipped to number 11 during Plaintiff's first year of law school, largely because the U.S. News and World Report had included incorrect employment statistics in calculating the school's rank, persons at Duke Law rushed off the correct employment information, so a supplemental sheet with the correct rank could be included with the erroneous rankings which had already been printed. First Am. Compl. at ¶ 152.

Plaintiff's objection to discriminatory practices at Duke Law that prompted the illegal surveillance that not only allowed the Duke Defendants, the Georgetown Defendants and the Microsoft Defendants to obtain information to discriminate against Plaintiff, but also allowed for private information, including medical information about Plaintiff, to be disseminated to many people. First Am. Compl. at ¶¶ 60, 68-69, 71-72. Although Plaintiff graduated from law school in late May of 2000, the illegal electronic surveillance that she was placed under has continued ever since and has followed Plaintiff no matter where she has lived or where she has went, for more than five (5) years. First Am. Compl. at ¶¶ 32, 38-40, 43-46, 49.

Nevertheless, the Duke Defendants were also so afraid that Plaintiff would sue them for discrimination that they not only illegally placed Plaintiff under electronic surveillance, but also placed <u>one</u> black female student on one of the school's most prestigious journal's, right after Plaintiff transferred from the school, for the first time in the history of the school. First Am. Compl. at ¶ 110. Still, the Duke Defendants were so afraid that Plaintiff would sue them for discrimination that they actually contacted and conspired with persons at Georgetown Law to adversely affect Plaintiff professionally, personally and academically. First Am. Comp. at ¶¶ 39, 59-60, 75, 170, 172-73, 175-79, 186-91.

More specifically, persons at Duke Law contacted and conspired with persons at Georgetown Law to adversely affect Plaintiff's overall educational experience at Georgetown Law, including lowering and adversely affecting Plaintiff's grades in a number of courses, as well as adversely affecting Plaintiff's classroom experience, journal experience and job prospects. First Am. Comp. at ¶¶ 147-48, 175-79, 186-91. Indeed, this conspiracy that existed between persons at Georgetown Law and Duke Law, and other defendants named herein, was essentially done to undermine any claim of discrimination that Plaintiff could make against the

Duke Defendants, which was always based on Plaintiff's race, ethnicity and gender. First Am. Compl. at ¶¶ 49, 142-43, 147, 178, 186-91.

Nevertheless, even though Plaintiff graduated from law school in May of 2000, the Duke Defendants and Georgetown Defendants still continued to interfere with Plaintiff personally and professionally. First Am. Compl. at ¶¶ 230-31, 287, 291-92. Indeed, the Duke Defendants, Georgetown Defendants, and Government Defendants, have all continued to conspire to keep Plaintiff under illegal electronic surveillance because they not only want to discriminate against Plaintiff professionally, which is why the illegal surveillance has existed where Plaintiff has worked, but also because they also wish to interfere with Plaintiff personally, as they fear that if Plaintiff is not kept under illegal electronic surveillance Plaintiff could have a relationship with a man who is both white and wealthy. First Am. Compl. at ¶¶ 46, 57, 64-65, 292.

The Microsoft Defendants did not join the conspiracy to discriminate against Plaintiff until Plaintiff's third year of law school. First Am. Compl. at ¶ 40. The Microsoft Defendants intercepted the illegal electronic surveillance that Plaintiff was being subjected to, and repeatedly used information they learned from the illegal electronic surveillance to exploit Plaintiff, benefit themselves financially, and also to harass Plaintiff by putting various things on the company's MSN website and connecting those things to Plaintiff. First Am. Compl. at ¶¶ 214-20, 223-32, 268-77.

## PROCEDURAL HISTORY

On May 8, 2003, Plaintiff commenced the instant action for damages, discrimination, injunctive and declaratory relief, alleging causes of action arising under the First, Fourth, Fifth, Eight, and Thirteenth Amendments to the United States Constitution, 18 U.S.C. §§ 2510-2522, 20 U.S.C. §§ 1681-1688, 42 U.S.C. § 1981, 42 U.S.C. § 1985, 42 U.S.C. § 1986, and 42 U.S.C.

§§ 2000d-2000d-7.  First Am. Compl. at ¶¶ 303-27.  Plaintiff also sought relief for state and territorial causes of action, including fraud, civil conspiracy, intentional infliction of emotional distress, invasion of privacy, interference with prospective advantage, and theft of intellectual property.  First Am. Compl. at ¶¶ 294-302, 328-42.   Plaintiff also requested punitive damages because the outrageous acts these Defendants have committed have been so illegal and have been done with such callous disregard for Plaintiff's rights.  First Am. Compl. at ¶¶ 343-44.  The Complaint was amended on June 5, 2003 to include the Microsoft Defendants (including Defendant Melinda Gates), and Defendant John Ashcroft, who has since been substituted by Alberto Gonzales.  *See* First Am. Compl.; V.I. Docket at 156.

After being served with Plaintiff's Complaint, the first thing Duke University did was to file a Motion for Enlargement of Time and for Initial Status Conference wherein they moved the Court to consider employing Rule 17(c) procedures in this case based on the discriminatory acts Plaintiff alleged that they had committed against her.  V.I. Docket at 55. Thereafter, the Duke Defendants further submitted a report by Dr. Rita Dudley-Grant, a psychologist, wherein Dr. Dudley-Grant, based on her opinion of the allegations in Plaintiff's Complaint, concluded that Plaintiff might be experiencing paranoid schizophrenia or a delusional disorder.  The other defendants in this case all joined in this motion.  *See* V.I. Docket at 53, 58.

Even though, from the outset, Plaintiff argued that the defendants in this case had misconstrued the law, and that Plaintiff's competency would have to be determined based on whether or not Plaintiff was able to protect her own interests, and whether she was able to understand the meaning and effect of the proceedings in this case, Magistrate Judge Jeffrey Resnick rejected Plaintiff's arguments.  Instead, based on arguments by the defendants and the conclusions submitted by Dr. Dudley-Grant, Magistrate Judge Resnick ordered Plaintiff to be

examined by Dr. Olaf Hendricks to determine her competency to prosecute the matter and

whether the text of her complaint demonstrated "delusional pyschosis, paranoid schizophrenia,

or any other mental illness of abnormality." V.I. Docket at 60. Dr. Hendricks then submitted a

report, which concluded, based on his personal opinion of the allegations in Plaintiff's

Complaint, that Plaintiff was suffering from a delusional disorder and was therefore incapable of

prosecuting this matter. Plaintiff then retained her own expert, Dr. Steven Handwerker, who

opined that Plaintiff's mental health was good and stable despite the sorts of stress that the

defendants in this case had subjected her to.[3] V.I. Docket at 72, Ex. 1.

Thereafter, despite Plaintiff's continued arguments that the defendants had misconstrued

the law, and Plaintiff's own expert report which stated that her mental health was good and

stable, Magistrate Judge Resnick, relying on Dr. Hendricks and Dr. Dudley-Grant's reports,

decided to go ahead and appoint a guardian *ad litem* to represent Plaintiff in this case. The

District Court Judge Thomas Moore affirmed his decision. Docket at 129. Plaintiff then

appealed both of these erroneous decisions to the Court of Appeals for the Third Circuit, and the

Third Circuit **vacated** the District Court's Order. *See Richards*, 2006 WL 162652 at *3. In

vacating the District Court's Order, the Third Circuit held that the District Court had abused its

discretion because it failed to apply the correct standard to determine whether a guardian *ad*

---

[3] Plaintiff's expert, Dr. Steven Handwerker, was a licensed psychologist from the state of Florida, who was also licensed in New York and South Dakota. *See* Curriculum Vitae of Dr. Steven Handwerker, V.I. Docket at 72, Ex. 2. He obtained his doctorate in psychology from New York University, and his post doctoral certification in clinical psychology from Hofstra University. *See id.* He served as the Director of Psychological Services at the Holistic Health Center (now called the New Center for Holistic Education and Research) in Manhasset, New York, from 1978-1988, before starting his private clinical practice. *See id.* He had authored a number of publications, and had given many presentations. *See id.* He was a board certified expert in traumatic stress, and was also board certified in forensic medicine and as a forensic examiner. *See id.*

*litem* could be appointed, which is whether a person is capable of taking care of themselves, or, put another way, whether a person is capable of protecting their own interests, and understanding the meaning and effect of the legal proceedings they have instituted.[4] *See id.* In addition, in vacating the District Court's Order, the Third Circuit also rejected the conclusions that Dr. Hendricks had reached, which had resulted from Magistrate Judge Resnick's misapplication of the law, and instead concluded, after reviewing information in the record, that Plaintiff was competent to proceed *pro se*. *See id.* The Third Circuit then remanded this matter to the District Court.

The Duke Defendants have now filed a motion to dismiss for lack of jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. Plaintiff now opposes this motion.

## STANDARD OF REVIEW

"On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff has the burden of establishing a prima facie case that personal jurisdiction exists." *Jin v. Ministry of State Security*, 335 F. Supp. 2d 72, 77 (D.D.C. 2004) (citing *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001). "A prima facie case in this context means that the plaintiff must present evidence sufficient to defeat a motion for judgment as a matter of law." *Jin*, 335 F. Supp. 2d at 77 (citations omitted). Indeed, "[t]he burden is on the plaintiff to articulate specific acts or contacts of the defendant that prove

---

[4] The Third Circuit did also hold that the District Court had abused its discretion because it failed to make any factual findings to support its decision to appoint a guardian *ad litem*. *See Richards*, 2006 WL 162652 at 3 (stating "[w]e conclude that the District Court abused its discretion in appointing a guardian ad litem because it did not apply the correct legal standard or make any factual findings to support such a decision"). Indeed, the Third Circuit, in rendering its decision, noted that the Magistrate Judge, in appointing a guardian *ad litem*, had failed to make any explicit factual findings to support his decision, and the District Court, in affirming the Magistrate's decision, simply stated, without further explanation, that he was doing so because of the reasons given by the defendants in their oppositions. *Id.*

jurisdiction can be exercised." *Johnson v. Long Beach Mortgage Loan Trust*, No. Civ. A. 05-0644 CKK, 2006 WL 2244599 at *5 (D.D.C. Aug. 4, 2006) (citations omitted).

"To determine if a basis for personal jurisdiction exists, the court should resolve factual discrepancies in the complaint and affidavits in favor of the plaintiff." *Jin*, 335 F. Supp. 2d at 77 (citing *Crane v. New York Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990). "However, the court need not treat all of the plaintiff's allegations as true." *Jin*, 335 F. Supp. 2d at 77. Indeed, "the court 'may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts.'" *Id.* (citation omitted).

## ARGUMENT

I.    **UNDER THE CONSPIRACY DOCTRINE, THIS COURT HAS JURISDICTION OVER ALL OF THE DUKE DEFENDANTS PURSUANT TO SECTION 13-423(a)(3) OF THE D.C. LONG ARM STATUTE AND THE DUE PROCESS CLAUSE OF THE U.S. CONSTIUTION**

In order "to establish personal jurisdiction over a non-resident defendant, a court must engage in a two-part inquiry: A court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements."[5] *GTE New Media Services Inc. v. Bellsouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).

The District of Columbia's long-arm statute provides, in relevant part, that a "court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia." D.C. Code Ann. § 13-423(a)(3) (2001). The statute

---

[5] When subject matter jurisdiction is predicated on a federal question, as is the case here, Plaintiff must rely on the District of Columbia's long-arm statute to sue non-resident defendants where no federal long-arm statute applies. *Edmond v. United States Postal Service General Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991).

also provides that "[w]hen jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him." *Id.* 13-423(b).

However, even where the requirements of the long-arm statute have been satisfied, a plaintiff must still show that the exercise of personal jurisdiction would be permissible under the Due Process Clause. As such, "a plaintiff must show 'minimum contacts' between the defendant and the forum establishing that 'the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *GTE*, 199 F.3d at 1347 (quoting *International Shoe Co. v. Washington*, 326 U.S. 316 (1945)). Indeed, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Jin*, 335 F. Supp. 2d at 78 (citations omitted). In sum, "the defendant's conduct with the forum State [must be] such that he should reasonably anticipate being haled into court there." *GTE*, 199 F.3d at 1347 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)).

Under the theory of conspiracy jurisdiction, "the defendant's 'contact' with the forum consists of the acts of the defendant's co-conspirators within the forum." *Jin*, 335 F. Supp. 2d at 78. As the Court explained in *Jin* "[b]ecause the District of Columbia long-arm statute provides for jurisdiction over persons acting directly *and* their agents, courts deem the defendant's co-conspirator the defendant's agent." *Id.* (citations omitted). However, "[a]s with other forms of personal jurisdiction, conspiracy jurisdiction requires a prima facie showing of pertinent jurisdictional facts." *Id.* As such, to prevail under a theory of conspiracy jurisdiction, courts

require "a prima facie showing of (1) a conspiracy[6] (2) in which the defendant participated and (3) a co-conspirator's overt act within the forum, subject to the long-arm statute and in furtherance of the conspiracy." *Id.* (citing *Jung v. Ass'n of American Med. Colleges*, 300 F. Supp. 2d 119, 141 (D.D.C. 2004). In addition, at least one Court in this jurisdiction has held that in addition to these three elements, a plaintiff must also show that a defendant purposely availed itself of the privilege of conducting activities in the forum to ensure that the Court's exercise of personal jurisdiction comports with the Due Process Clause. *Jin*, 335 F. Supp. 2d at 80.

In the case *sub judice*, it is clear that this Court may exercise personal jurisdiction over all of the Duke Defendants under the conspiracy doctrine. Indeed*,* even though Plaintiff had been discriminated against during her first year of law school at Duke Law, she nevertheless chose to transfer to Georgetown Law, which is located in the District of Columbia, to complete her legal education. First Am. Compl. at ¶¶ 31-32, 34-37, 104-06, 124-31; Ex. 1, Decl. at ¶ 16. However, persons at Duke Law nevertheless contacted and conspired with persons at Georgetown Law to continue to discriminate against Plaintiff, and adversely affect her academically, professionally and personally, to essentially undermine and discredit any claim of discrimination that Plaintiff could make against them.[7] First Am. Comp. at ¶¶ 39, 59-60, 75, 170, 172-73, 175-79, 186-91.

---

[6] The four elements of civil conspiracy are: (1) an agreement between two or more persons; (2) to participate in an unlawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of the conspiracy. *Jin*, 335 F. Supp. 2d at 79 n.4. In addition, "a party seeking to recover for civil conspiracy must allege an underlying tortious act." *Id.*

[7] It should be noted that law professors, who are already entrenched in the legal community, are persons that are very much connected to each other, which would only have made it that much easier for persons at Duke Law to contact and conspire with persons at Georgetown Law to discriminate against Plaintiff. For example, during Plaintiff's first semester of her first year of law school, Plaintiff's Property class was taught by Professor Laura Underkuffler, who is a professor at Duke Law. Ex. 1, Decl. at ¶ 24-25. However, Professor Underkuffler also taught at Georgetown Law as a Visiting Professor, during the Spring of 2000, which was Plaintiff's last

More specifically, persons at Duke Law contacted and conspired with persons at Georgetown Law to adversely affect Plaintiff's overall educational experience at Georgetown Law, including lowering and adversely affecting Plaintiff's grades in a number of courses, as well as adversely affecting Plaintiff's classroom experience, journal experience and job prospects. First Am. Comp. at ¶¶ 147-48, 175-79, 186-91. In fact, it should be noted that persons at Duke Law had already contacted persons at Georgetown Law, in furtherance of the conspiracy to discriminate against Plaintiff, before Plaintiff had even arrived at Georgetown Law. First Am. Compl. at ¶¶ 173. As a result, even though Plaintiff, upon her transfer to Georgetown Law, became one of approximately 1800 students at the school, she was nevertheless the first person called on in her Civil Rights class during her first semester at Georgetown Law, and then during her second semester, she was called on six or seven times in a Corporations class that she had took, even though there were other students in the class that were called on two or three times, at the most, and there was at least one student that did not appear to have been called on even once. First Am. Compl. at ¶¶ 174-75, 179; Ex. 1, Decl. at ¶ 17.

Furthermore, at the end of Plaintiff's second year of law school at Georgetown Law, Plaintiff had submitted a draft of an article that she had worked on, which involved equal protection gender jurisprudence, to the *Georgetown Journal of Gender and the Law*, because Plaintiff had always been interested in issues related to gender. First Am. Compl. at ¶ 188; Ex. 1, Decl. at ¶ 18-19. Although Plaintiff was a third year law student at Georgetown Law at the time the draft was being edited, the draft was radically changed to include issues related to sexual orientation, and no one ever advised Plaintiff about any of the changes that were made to

---

semester of law school at Georgetown Law, Ex. 1, Decl. at ¶ 26, and which, incidentally, was during a period of time when Plaintiff was being discriminated against by persons at Duke Law and Georgetown Law.

the draft.  First Am. Compl. at ¶¶ 189-90; Ex. 1, Decl. at ¶ 20-21.  In fact, even though Plaintiff

had contributed little to the article that was ultimately printed, and she had no knowledge of the

sexuality issues included in the article, Plaintiff's name nevertheless appeared on the article as

though she wrote it.  First Am. Comp. at ¶ 191; Ex. 1, Decl. at ¶ 22.  Plaintiff did not even learn

about the changes that had been done to the article until she saw copy of the article, for the first

time, in December of 2001, which was about a year and a half after she had graduated from law

school.  First Am. Compl. at ¶¶ 32, 191; Ex. 1, Decl. at ¶ 21.  In fact, it should also be noted that

during Plaintiff's third year of law school at Georgetown Law, Plaintiff even had a professor

announce, in a civil rights class that she was taking, that for the first time in all the years that he

had been teaching the class, he was going to include a day on homosexual civil rights issues.

First Am. Compl. at ¶ 192; Ex. 1, Decl. at ¶ 23.

        At any rate, persons at Duke Law did not just contact persons at Georgetown Law to

discriminate against Plaintiff.  Rather, they also contacted the Government Defendants and

conspired with them to illegally place and continuously keep Plaintiff under electronic

surveillance, including in the District, so that they could obtain information to discriminate

against Plaintiff.  First Am. Compl. at ¶¶ 38-39.  In fact, Plaintiff first realized she had to have

been placed under some form of illegal electronic surveillance when a conversation she had had

in her home, in Durham, North Carolina, at the end of her first year at Duke Law, about medical

information, appeared to have been disclosed to persons who should not have had that

information.  First Am. Compl. at ¶ 165; Ex. 1, Decl. at ¶ 27.  Indeed, even after Plaintiff

transferred to Georgetown Law, and was living in Washington, D.C.[8], it nevertheless appeared,

---

[8]   Plaintiff lived in Washington, D.C. from January of 1999 through May of 1999 and from
August of 1999 through August of 2000.  Ex. 1, Decl. at ¶ 31.  In addition, Plaintiff was a
student at Georgetown Law from August of 1998 through late May of 2000.  Ex. 1, Decl. at 31.

again, that medical information from an examination she had had at the Gewirz Student Center, at Georgetown Law, had been disseminated to persons who should not have had that information because of the illegal electronic surveillance.  First Am. Compl. at ¶ 60; Ex. 1, Decl. at ¶ 28.

In the case *sub judice*, it is clear that under the conspiracy doctrine, when persons at Duke Law contacted and conspired with persons at Georgetown Law to discriminate against Plaintiff, and persons at Georgetown Law committed overt acts in furtherance of this conspiracy, the Duke Defendants committed acts in the District.  Similarly, it is clear, under the conspiracy doctrine, that when persons at Duke Law contacted and conspired with the Government Defendants to illegally place and keep Plaintiff under electronic surveillance in the District, in furtherance of the existing conspiracy to discriminate against Plaintiff, and the Government Defendants placed Plaintiff under illegal electronic surveillance in the District, the Duke Defendants committed acts within the District.  Indeed, it should also be noted that Plaintiff's claims in this case arise out of the discrimination and the continuous illegal surveillance that she has been subjected to.  *See* First Am. Compl.

Further, Plaintiff has alleged that as a result of the discrimination that she has experienced, and the presence of the illegal electronic surveillance that has been used to further the discrimination that she has been subjected to, Plaintiff has suffered a number of injuries, which include loss of enjoyment of life, loss of reputation, loss of capacity to earn income, and emotional injuries that occurred here in the District when the acts were committed here against Plaintiff.  First Am. Compl. at ¶ 293.  In fact, it should be noted that even Plaintiff's expert, Dr. Steven Handwerker, diagnosed Plaintiff with Post Traumatic Stress Disorder because of the sort of discriminatory acts that the defendants in this case had subjected her to.  V.I. Docket at 72, Ex. 1.

It should also be noted that the exercise of personal jurisdiction would comport with the Due Process Clause.  Indeed, in the case *sub judice*, it is clear that the Duke Defendants purposely availed themselves of the privilege of conducting activities in this forum.  Plaintiff transferred from Duke Law to Georgetown Law, yet persons at Duke Law nevertheless contacted persons at Georgetown Law to continue to discriminate against Plaintiff in the District.  In fact, persons at Duke Law even contacted and conspired with the Government Defendants to illegally place and keep Plaintiff under surveillance in a number of places where Plaintiff has lived, and this includes the District.  Moreover, it should be noted that Plaintiff has alleged that even persons who sat on the Duke University Board of Trustees were aware of the discrimination and nevertheless joined in the existing conspiracy to discriminate against Plaintiff.[9]  First Am. Compl. at ¶ 101-02.  In fact, Plaintiff has alleged that Nannerl Keohane, who was the President of Duke University while Plaintiff was being discriminated against, and who, by virtue of her office, was also on the Duke University Board of Trustees, was also aware of the discrimination that Plaintiff was being subjected to, and she nevertheless joined in the conspiracy to discriminate against Plaintiff.  First Am. Compl. at ¶¶ 6, 98-100, 229-30.

Interestingly enough, it should be noted that none of the Duke Defendants have denied that there was a conspiracy to discriminate against Plaintiff or that they committed acts in furtherance of the conspiracy, and this alone is sufficient to find that there was a conspiracy, that they were a part of it, and therefore this Court may exercise personal jurisdiction over each of

---

[9]  Defendant Melinda Gates was a member of the Duke University Board of Trustees for the entire time that Plaintiff was being discriminated against and Plaintiff knows that she has intercepted statements that Plaintiff had made in her home because Plaintiff even read a magazine article where statements that Plaintiff made in her home were actually attributed to Defendant Melinda Gates.  First Am. Comp. at ¶¶ 248-50; Ex. 1, Decl. at ¶¶ 29-30.  In fact, it should be noted that the statements in question were actually statements that Plaintiff made during the Spring of 2000 while she was living in the District of Columbia.  Ex. 1, Decl. at ¶ 30.

them.  *See Mandelkorn v. Patrick*, 359 F. Supp. 692, 696-97 (D.D.C. 1973) (holding that where

there were unchallenged allegations of a conspiracy, and an overt act in the District in

furtherance of the conspiracy, the Court would exercise personal jurisdiction over the non-

resident defendants).  Indeed, in the case *sub judice*, Ms. Kate Hendricks has proffered a

Declaration, under penalty of perjury, on behalf of Duke University, Duke Law, and the Duke

Board of Trustees, that does not address any of the allegations that relate to the discrimination

that Plaintiff experienced while she was in law school or the illegal electronic surveillance that

was used to facilitate that discrimination.[10]  *See* D.C. Docket at 17, Ex. 1.  In fact, even though it

has been more than three (3) years since the Complaint in this matter was filed, there is nothing

in Ms. Hendricks' Declaration that indicates that anyone at Duke has even investigated any of

the allegations in Plaintiff's Complaint.  Indeed, even if Duke, Duke Law, and the Duke

---

[10]   Although the Declaration proffered by Ms. Hendricks does not address any of the allegations
that relate to the discrimination that Plaintiff experienced or the illegal electronic surveillance
that she was subjected to, it does nevertheless attempt to dispute certain allegations that Plaintiff
has made in her Complaint.  Plaintiff has alleged that the Duke University Board of Trustees is
comprised of thirty-six (36) elected members **and** the President of Duke University, *ex officio*.
First Am. Compl. at ¶ 6.  In fact, if this Court were to go to Duke University's website, which is
located at www.duke.edu, and click on the link entitled "About Duke", and then click on the link
entitled "Board of Trustees", this Court would find that there are actually thirty-seven (37)
members of the Board – thirty-six (36) of whom are presumably the elected members and Dr.
Richard Brodhead, who is currently the President of Duke.  *See* Ex. 2.  In fact, according to Duke
University's website, Dr. Brodhead is even a member of the Board's Executive Committee.  *See
id.*  Nevertheless, despite this, Ms. Hendricks has represented that the Board of Trustees is
comprised of thirty-six elected members.  *See* D.C. Docket at 18, Ex. 1.  It is unclear why Ms.
Hendricks has neglected to mention that the President of the University is also a member of the
Board of Trustees.  In addition, Plaintiff has alleged that Melinda Gates sat on the Board of
Trustees for the entire time that Plaintiff was discriminated against by the Duke Defendants, the
Georgetown Defendants and the Government Defendants.  First Am. Compl. at ¶ 197.  In fact,
the Microsoft Defendants have confirmed that Melinda Gates served on the Board of Trustees
from 1996 through 2003.  V.I. Docket at 220, Microsoft Defs. Mem. of Law at 3 n.2.  As such, in
light of the fact that Melinda Gates, and others, like former President Keohane, have served on
the Board of Trustees for more than two years, it is unclear what Ms. Hendricks meant when she
said that the Board's "membership changes every two years."  D.C. Docket at 18, Ex. 1.  Indeed
this statement, taken literally, would seem to fly in the face of the record in this case.

University Board of Trustees were to now try to deny the allegations, it does not appear that they would be able to proffer a basis for the denial, like a showing of any investigation, including the nature and scope thereof, that they undertook in this matter.

Similarly, Defendant Nannerl Keohane has also utterly failed to address any of the allegations that relate to the discrimination that Plaintiff experienced in law school or the use of illegal surveillance to facilitate the discrimination. In fact, Defendant Keohane does not deny that she was aware of a conspiracy to discriminate against Plaintiff or that she was a part of that conspiracy. More specifically, Defendant Keohane does not deny that she knew that Plaintiff was discriminated against while she was a first year law student at Duke Law or that after Plaintiff transferred to Georgetown Law, persons at Duke Law contacted persons at Georgetown Law and the purpose of the contacts was to discriminate against Plaintiff and adversely affect her academically, professionally and personally. Indeed, Defendant Keohane does not even deny that persons at Duke Law contacted the Government Defendants to illegally place Plaintiff under electronic surveillance to obtain information to discriminate against Plaintiff. In fact, Defendant Keohane has not denied receiving information about Plaintiff from the illegal electronic surveillance or even using information from the surveillance to discriminate against Plaintiff.

Plaintiff is aware that Defendant Keohane was the President of Duke University during the time that Plaintiff was being discriminated against, and that Plaintiff has sued her herein in her personal capacity. However, even though Defendant Keohane was an officer of Duke University, she can still be held liable for civil conspiracy in her personal capacity. "In order to plead a conspiracy between a corporation and its agents, a plaintiff must claim that the agents were acting outside the scope of employment or [committed acts that] 'were taken solely for personal, non-business motivations.'" *Wiggins v. Equifax*, 853 F. Supp. 500, 504 (D.D.C. 1994)

(citation omitted).  Here, Plaintiff has brought this action against Defendant Keohane because of her involvement in a conspiracy to discriminate against Plaintiff based on her race, gender and ethnicity.  First Am. Compl. at ¶¶ 98-100, 229-30, 293.  As such, it is clear that Defendant Keohane was acting outside the scope of her employment, and committed acts that were solely for personal reasons, because where an individual is motivated by racial bias they are not acting out of concern for the best interests of their employer.  *See Coley v. M & M Mars, Inc*, 461 F. Supp. 1073, 1076-77 (M.D. Ga. 1978) ("Where race relations and not business matters are involved, this court must conclude that such a complaint sufficiently alleges the likelihood of personal, non-business motivation on the part of these two defendants.").

Accordingly, Defendant Keohane can be held liable for civil conspiracy, and this Court may exercise personal jurisdiction over Defendant Keohane under the conspiracy doctrine. Further, as Plaintiff has established that there was a conspiracy, in which all of the Duke Defendants participated, and the Georgetown Defendants and the Government Defendants committed overt acts in furtherance of the conspiracy in this forum, and the Duke Defendants purposely availed themselves of the benefits of this forum, this Court may exercise personal jurisdiction over all the Duke Defendants in this case.[11]

---

[11]   The Duke Defendants, in arguing against this Court exercising personal jurisdiction pursuant to Section 13-423(a)(3), did not even address any of the contacts that Plaintiff alleged persons at Duke Law made to persons at Georgetown Law to discriminate against Plaintiff.  Rather, the Duke Defendants only addressed Plaintiff's allegations as to the illegal electronic surveillance, and even then, their sole argument was that the allegations were conclusory.  *See* Duke Defs. Mem. of Law at 12.  However, the Duke Defendants argument is clearly misplaced as Plaintiff has provided specific instances of her being subjected to illegal electronic surveillance and the Duke Defendants have not even denied any allegation related to the use of illegal electronic surveillance to violate Plaintiff's rights.

## II.    IN THE ALTERNATIVE, EVEN IF, ON THE EXISTING RECORD, THERE ARE INSUFFICIENT GROUNDS TO SUPPORT JURISDICTION OVER ALL OF THE DUKE DEFENDANTS, PLAINTIFF IS ENTITLED TO DISCOVERY

"As a general matter, discovery under the Federal Rules of Civil Procedure should be freely permitted and this is no less true when discovery is directed to personal jurisdiction." *Edmond v. United States Postal Service General Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991). Indeed, "[a] plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum." *Diamond Chemical Co., Inc. v. Atofina Chemicals, Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003) (citing *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996)).

The D.C. Circuit has held that when personal jurisdiction is based on the conspiracy doctrine, "it is an abuse of discretion to deny jurisdictional discovery where the plaintiff has alleged: (1) the existence of a conspiracy; (2) the nonresident's participation; and (3) an injury-causing act of the conspiracy within the forum's boundaries." *Edmond*, 949 F.2d at 425. Although, generally speaking, "if a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified." *GTE*, 199 F.3d at 1351-52 (citing *Crane v. Carr*, 814 F.2d 758, 760 (D.C. Cir. 1987)). "In order to get jurisdictional discovery a plaintiff must have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant." *Diamond Chemical*, 268 F. Supp. at 15 (citations omitted).

In the case *sub judice*, Plaintiff has established that the there was a conspiracy, that the Duke Defendants participated in this conspiracy, and that there were injury causing acts of the conspiracy within this jurisdiction, and therefore Plaintiff is entitled to jurisdictional discovery.

20

*See supra* at 12-15; *Jin*, 335 F. Supp. 2d at 83-84 (granting plaintiff's request for jurisdictional discovery where plaintiff plead the three elements in *Edmond*). However, even if this Court finds that Plaintiff has not sufficiently plead the three elements in *Edmond*, she would still be entitled to jurisdictional discovery where she has a good faith belief, as she does here, that such discovery will be able to show that this court can exercise personal jurisdiction over these defendants. *See GTE*, 199 F.3d at 1351-52; *Diamond Chemical*, 268 F. Supp. at 15-16.

Here, Plaintiff requests that she be allowed to obtain jurisdictional discovery so that she can obtain information regarding the full scope of the contacts that exists between the Duke Defendants and this forum. Plaintiff also seeks jurisdictional discovery to allow her to obtain information about the Duke Defendants full involvement in the conspiracy to discriminate against her and violate her rights. Plaintiff has not had the opportunity to obtain discovery from any of the defendants in this case before and Plaintiff submits that there is a great deal of discoverable information that is in their possession. It should also be noted that Ms. Hendricks has even represented, in her Declaration, that "[a] small number of Duke University's adjunct faculty live in D.C." D.C. Docket at 17, Ex. 1. However, Ms. Hendricks has not advised who these people are or even whether they have or have had any connection to any of the other defendants in this case or whether any of these people may have had any involvement in any of the acts that have been alleged in Plaintiff's Complaint.

Further, it should be noted that Plaintiff may also be able to establish jurisdiction over Duke University and Duke Law pursuant to Section 13-423(a)(4) to the extent that these defendants have engaged in any persistent course of conduct in the District. Of course the Duke Defendants do state, in their Motion to Dismiss for lack of personal jurisdiction, that "Duke does not engage in any conduct in the district, persistent or otherwise" and that Duke "does not derive

substantial revenue from D.C." Duke Defs. Mem. of Law at 13-14. However, while the Duke

Defendants cite to Ms. Hendricks' Declaration as evincing support for these statements, there is

nothing is Ms. Hendricks' Declaration that supports these assertions.[12] *See* D.C. Docket 17 at

Ex. 1. Nevertheless, at a later point in the Duke Defendants motion, they argue against this

Court exercising general jurisdiction over the Duke Defendants by stating that "the fact that

Duke sends recruiters to D.C., receives students *and revenue*, from D.C. and has faculty residing

in D.C. is insufficient" to confer general jurisdiction. Duke Defs. Mem. of Law at 21. (emphasis

added).

     In the case *sub judice*, Plaintiff would request that she be allowed to obtain discovery as

to the full scope of Duke University and Duke University School of Law's non-governmental

activities in the District, to include the amount of revenue that is derived from the District, the

nature and extent of contact that is made in the District for recruitment of students and the

maintenance of contact with alumni, including the number of alumni magazines and the like that

is sent into the District. As the D.C Circuit noted in *Crane*, "[u]nder (a)(4), the business done or

persistent course of conduct "plus factor" is satisfied by connections considerably less substantial

than those it takes to establish general, all-purpose "doing business" – or "presence"-based

jurisdiction." *Crane*, 814 F.2d at 763 (citations omitted). In fact, "unlike the 'transacting

business' nexus employed in D.C. Code § 13-423(a)(1), subsection (a)(4) contemplates a

connection that may by *un* related to the claim in suit." *Id.*

---

[12] In fact, if anything, Ms. Hendricks' Declaration flatly contradicts what the Duke Defendants
have stated in their motion as Ms. Hendricks has represented the following: (1) Neither Duke
University nor Duke University School of Law conducts business in Washington, D.C. *other*
than government relations and lobbying activities; and (2) Duke University School of Law on
occasion sends representatives to Washington, D.C. to conduct general recruiting activities. D.C.
Docket at 17, Ex. 1 (emphasis added).

Accordingly, for the reasons that have been stated herein, even if this Court were to find, on this record, that there are insufficient grounds to support personal jurisdiction over all of the Duke Defendants, Plaintiff would nevertheless be entitled to jurisdictional discovery. *See GTE*, 199 F.3d at 1351-52; *Edmond*, 949 F.2d at 425-26; *Crane*, 814 F.2d at 760, 764; *Jin*, 335 F. Supp. 2d at 83-84; *Diamond Chemical*, 268 F. Supp. 2d at 15-16; *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144, 151 (D.D.C. 1976).

## <u>CONCLUSION</u>

Accordingly, for the reasons that have been stated herein, the Duke Defendants' Motion to Dismiss pursuant to Rule 12(b)(2) should be denied in its entirety. However, if this Court determines that there are insufficient grounds, on this record, to support jurisdiction over the Duke Defendants, Plaintiff hereby requests that she be granted leave to take jurisdictional discovery.

Respectfully submitted,
ATTORNEY FOR PLAINTIFF,


DATED: August 25, 2006                _____/s/_____
                                      Suzette Richards, *Pro Se*
                                      P.O. Box 223875
                                      Christiansted, St. Croix  00822-3875
                                      Telephone: (340) 277-4808
                                      Fax: (340) 772-5785

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of August, 2006, a true and exact copy of the foregoing document was caused to be served via electronic notification upon:

Simone R. D. Francis, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, L.L.C.
The Tunick Building, Suite 202
1336 Beltjen Road
St. Thomas, U.S. Virgin Islands  00802
Simone.francis@ogletreedeakins.com

Richard Hunter, Esq.
Hunter, Cole & Bennett
Pentheny Bld., 3rd Floor
1138 King Street, Suite 301
Christiansted, St. Croix  00820
rhunter@hcbvilaw.com

Michael J. Murphy, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
2400 N Street, N.W., Fifth Floor
Washington, D.C. 20037
Michael.murphy@odnss.com

Elizabeth O'Brien, Esq.
Williams & Connolly LLP
725 Twelfth Street
Washington, D.C. 20002
eobrien@wc.com

Henry Feuerzeig, Esq.
Dudley, Topper & Feuerzeig
1A Frederiksberg Gade
P.O. Box 756
St. Thomas, V.I. 00804
hfeurzeig@dtflaw.com

Benton G. Peterson, Esq.
Assistant United States Attorney
Judiciary Center Building
Civil Division
555 4th St., N.W., Room E4905
Washington, D.C. 20530
Benton.peterson@usdoj.gov

Charles E. Buffon, Esq.
Harry B. Roback, Esq.
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
cbuffon@cov.com
hroback@cov.com

_____ /s/ _____
Suzette Richards, *Pro Se*

24